IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG

RONALD DALE JOHNSON,

      Petitioner,

v.                          Case No. 6:07-cv-00259

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.


**PROPOSED FINDINGS AND RECOMMENDATION**

Pending is Respondent's Motion for Summary Judgment (docket sheet document # 10).  This matter is assigned to the Honorable Joseph R. Goodwin, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

**PROCEDURAL HISTORY AND PETITIONER'S CLAIMS FOR RELIEF**

Petitioner's criminal proceedings and direct appeal

On September 17, 1998, Petitioner was indicted by a Wood County Grand Jury on one count of Murder in the First Degree (Count One), one count of Attempted Murder in the First Degree (Count Two) and one count of Malicious Assault (Count Three) (Case No. 98-F-125). (# 12, Ex. 1).  After a six-day jury trial, on December 16, 1999, Petitioner was found guilty on all charges.  (Id., Ex. 2).

By Order entered on February 25, 2000, Petitioner was sentenced to consecutive sentences of life without mercy on Count One, one to five years on Count Two, and two to ten years on Count Three. (Id., Ex. 3).

On September 19, 2000, Petitioner, by counsel, filed a Petition for Appeal in the Supreme Court of Appeals of West Virginia (the "SCAWV"), asserting the following grounds for relief:

A.   Due to deception by the detective who interrogated the Appellant, the Appellant was deprived of his opportunity to make an informed, knowing and intelligent decision as to whether he should or should not waive his Miranda rights. Therefore, the lower court should have prohibited the State of West Virginia from introducing into evidence his extrajudicial inculpatory statement in order to prove his guilt.

B.   The warrantless seizure of evidentiary items from Appellant's residence by Detective K.L. Miller and the photographing of the interior of the Appellant's residence by detective R.B. Bargeloh of the Parkersburg City Police Department was unlawful.

C.   The lower court erred and the Appellant was prejudiced by the testimony of Patricia Mollohan concerning how she had been adversely affected by the injuries sustained by her husband.

D.   The lower court erred by permitting the jury to deliberate upon a verdict of Murder in the First Degree, the State of West Virginia having failed to present a prima facie case as to the offense of Murder in the First Degree and in particular to present evidence concerning a specific intent to kill.

(Id., Ex. 4). The SCAWV refused the Petition for Appeal on February 20, 2001. (Id.)

2

<u>Petitioner's state court habeas corpus proceedings</u>

On March 19, 2001, Petitioner filed a <u>pro</u> <u>se</u> Petition for a Writ of Habeas Corpus in the Circuit Court of Wood County (<u>State ex rel. Johnson v. Painter</u>, using Petitioner's criminal case number, Case No. 98-F-125).   The <u>pro</u> <u>se</u> petition raised the following grounds for relief:

   1.   The Petitioner was clearly denied effective assistance of counsel during his trial and appeal. Petitioner's trial counsel was unprepared for trial.  He failed to investigate leads, witnesses and lab reports.  This is contrary to [and] an unreasonable application of clearly established United States precedent setting law, and violated the Petitioner's right under the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and violated Article III, Section 10, and 14 of the West Virginia Constitution.

   2.   The Petitioner maintains his life sentence is not supported by clear and convincing evidence.  The evidence only at best would have supported a manslaughter or no more than second degree murder. His first degree murder conviction is clearly contrary to [and] an unreasonable application of clearly established United States, precedent setting law, and violated the Petitioner's right under the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and violate Article III, Section 10, and 14 of the West Virginia Constitution.

   3.   The Court violated the Petitioner's right by allowing any alleged evidence or statement to be presented before the jury as they were the product of an illegal arrest.  Petitioner was denied his right to be promptly taken before the magistrate in a timely fashion which lead to an illegal arrest, and seizure of illegal evidence.  The Petitioner was denied his right to be taken promptly before the county magistrate upon probable cause by city police to arrest the Petitioner at 2:09 a.m. on

> July 7, 1998. Every act from this point was
> clearly act to obtain incriminating information and
> evidence they believed the Petitioner had
> information about, against his will. This is
> contrary to [and] an unreasonable application of
> clearly established United States, precedent
> setting law, and violated the Petitioner's right
> under the First, Fifth, Sixth and Fourteenth
> Amendments to the United States Constitution and
> violate Article III, Section 10, and 14 of the West
> Virginia Constitution.

(Id., Ex. 5).

On March 21, 2001, the Circuit Court of Wood County appointed attorney Ernest Douglass to represent Petitioner in his habeas corpus proceeding, and directed Mr. Douglass to file an Amended Petition, using the checklist of potential grounds for relief found in Losh v. McKenzie, 277 S.E.2d 606, 611 (W. Va. 1981). (Id., Ex. 6 at 1).

On January 6, 2004, Petitioner, by counsel, filed an Amended Petition. A copy of the Amended Petition is not included in the records before this court. However, from a review of the "Opinion Order Denying Writ of Habeas Corpus Following Omnibus Hearing," it appears that the following grounds for relief were raised in the Amended Petition:

**Ground One:** Alleged ineffective assistance of counsel (of which there were the following 17 claims:

(1)  Trial counsel's failure to object to State
     obtaining blood sample of Petitioner and to the
     State's argument that Petitioner's age should not
     be considered by the jury in their decision whether
     or not to recommend mercy.

4

(2) Failure of counsel to file proper motions to State
Supreme Court to prevent tainted evidence secured
against the Petitioner's Fourth and Fifth Amendment
rights to the United States Constitution.

(3) Failure of counsel to file motions against Double
Jeopardy in the indictment.

(4) Trial counsel failed to obtain and use a firearm
expert to assist in cross-examination of the
State's expert and/or his impeachment.

(5) Trial counsel failed to make use of photographs of
the Petitioner in Petitioner's possession at trial.

(6) Trial counsel was ineffective by failing to object
to inflammatory, improper prosecutorial comments.

(7) Trial counsel failed to keep Petitioner informed of
critical aspects of his case.

(8) Trial counsel [was] ineffective for failure to
timely obtain interview report from private
investigator.

(9) Trial counsel [was] ineffective for failure to make
use of grand jury minutes to impeach and cross-
examine witnesses.

(10) Trial counsel was ineffective for failing to call
witnesses material to the defense.

(11) Trial counsel was ineffective for failing to
request State's witnesses' prior statements before
cross-examination.

(12) Trial counsel was ineffective for failing to
consult with a "medical expert" on intoxication of
a defendant who had consumed an undetermined amount
of drinks one could consume in the period of time
set forth in this case.

(13) Trial counsel failed to interview or prepare for
trial any of the defense witnesses.

(14) Trial counsel was ill prepared and ineffective at
trial in the use of Investigator Robert S. White,
an expert in ballistics, "Forensic Science."

(15) Trial counsel for Petitioner failed to press the fact that the angle in which Petitioner was standing, or at the time he fell, the shotgun of Petitioner could not have been the gun that inflicted the fatal shot to the victim (Coleman).

(16) Trial counsel failed to retain an independent DNA expert to impeach the testimony of State witness Sonya [sic; Soraya] McClung, Charleston Forensic Analyst.

(17) Trial Counsel was ineffective for failure to seek a bifurcation of Petitioner's trial such that the jury could hear mitigating evidence during the sentencing phase after the return of the guilty verdict.

**Ground Two:** Petitioner maintains the evidence does not support his conviction in violation of the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article III, Sections 10 and 14 of the West Virginia Constitution.

**Ground Three:** The Court violated Petitioner's constitutional rights by allowing evidence that was the product of an illegal search to be admitted at trial and Petitioner was denied his right to be promptly taken before a magistrate.

**Ground Four:** Petitioner's indictment violated Petitioner's constitutional rights against Double Jeopardy as guaranteed by the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article III, Sections 10 and 14 of the West Virginia Constitution.

**Ground Five:** Petitioner was denied a fair trial when the Court entered into evidence items seized from Petitioner's home subsequent to an illegal search and seizure.

**Ground Six:** Petitioner was denied a fair trial because of prosecutorial misconduct from the opening statements throughout trial and in his closing argument, all of which violated Petitioner's right to a fair trial.

**Ground Seven:** Alleged violation of Petitioner's rights because the State used testimony they knew or should have known was perjury.

**Ground Eight:** Petitioner's rights were violated when the Court failed to give Defendant's jury instruction No. 5.

**Ground Nine:** Petitioner's rights were violated when the Court failed to give State's jury instructions Nos. 1, 2 and 4.

**Ground Ten:** Petitioner's rights were violated when the Court denied Petitioner's Motion for a Bill of Particulars.

**Ground Eleven:** Petitioner's constitutional rights were violated when the Court denied Petitioner's Motion to Dismiss.

**Ground Twelve:** Petitioner's rights were violated when State failed to comply with timely discovery and the agreement waiving the preliminary hearing denied Petitioner a speedy trial.

**Ground Thirteen:** Trial Court abused its discretion by allowing Michael Mollohan's wife to testify regarding how the crime had affected her family.

(Id., Ex. 6).

The Respondent was ordered to file an answer to the Amended Petition.  Petitioner then filed a Motion for Court Approval of Retaining Expert Witnesses and to Release DNA Test Records.  A hearing was held on the motion on March 8, 2004, and the habeas court allowed the hiring of an expert on the issue of ineffective assistance of counsel, but held the other issues in abeyance pending a status conference on June 14, 2004.  (Id.)

On April 6, 2004, the Respondent filed his answer to the Amended Petition.  (Id.)  At the status conference on June 14,

7

2004, the Court denied Petitioner's Motion for Court Approval of Retaining Experts in the Field of Ballistics and DNA Testing. (Id.)

An omnibus hearing was held on January 18, 2005, during which Petitioner testified and counsel presented arguments concerning the various grounds for habeas corpus relief.  An additional hearing was held on June 3, 2005, during which Petitioner's trial counsel, William Kiger, testified.  Before that hearing took place, however, on April 7, 2005, Petitioner filed a Petition for a Writ of Prohibition with the SCAWV, seeking the reversal of the habeas court's denial of Petitioner's motion to allow the hiring of expert witnesses on ballistics, DNA testing and intoxication.  The SCAWV refused that petition on May 11, 2005.  (Id. at 2).

During the second omnibus hearing, Petitioner's counsel renewed his motion for court approval of the hiring of intoxication and firearms experts, which was again denied.  (Id.)  The parties were then permitted to submit post-hearing briefs.  (Id.)  On June 27, 2006, the habeas court entered an "Opinion Order Denying Writ of Habeas Corpus Following Omnibus Hearing," which contained findings of fact and conclusions of law, and denied each and every ground for relief raised in the Amended Petition, and dismissed the Amended Petition.  (Id.)

<u>Petitioner's state habeas appeal</u>

On December 28, 2006, Petitioner, by new counsel, John N. Ellam, filed a Petition for Appeal from the denial of Petitioner's Amended Habeas Corpus Petition in the Circuit Court of Wood County. (<u>Id.</u>, Ex. 7).  The Petition for Appeal largely raised the same grounds as those raised in his Wood County petition; however, for the sake of completeness, the undersigned will list the specific grounds raised in the Petition for Appeal:

A.   Whether the Circuit Court erred by finding that the Petitioner was not deprived of his constitutional right to effective assistance of counsel in violation of his right under the Fifth and Sixth Amendments to the United States Constitution and Article III, Section 10 and 14 of the WV Constitution given the multiple errors and omissions by trial counsel.

B.   Whether the Circuit Court erred by finding that the Petitioner's claim that the evidence was insufficient to support his convictions was barred under W. Va. Code Section 53-4A-1(b)(c) as previously and finally adjudicated.

C.   Whether the Circuit Court erred by finding the Petitioner's claim of use of illegally seized evidence and claim of violation of the prompt presentment rule were barred under W. Va. Code Section 53-4A-1(b)(c) as previously and finally adjudicated.

D.   Whether the Circuit Court erred by finding that the Petitioner's claim that his rights were violated for the court imposing two separate charges from one single act (Double Jeopardy) were waived under W. Va. Code Section 53-4A-1(c).

E.   Whether the Circuit Court erred by finding that the Petitioner's claim of error by allowing into evidence items seized from his home during an illegal search and seizure were barred as being

9

previously and finally adjudicated.

F.     Whether the Circuit Court erred by finding that the Petitioner's claim of prosecutorial misconduct due to inflammatory statements being made throughout the trial was not proven by a preponderance of evidence.

G.     Whether the Circuit Court erred by finding that the Petitioner failed to allege a denial of a constitutional right when he claimed error was committed by the state using what they knew or should have known was perjured testimony.

H.     Whether the Circuit Court erred by finding that the Petitioner's claim that his constitutional rights were violated when the court failed to give defendant's jury instruction No. 5 was barred as being previously and finally adjudicated.

I.     Whether the Circuit Court erred by finding that the Petitioner's claim that his constitutional rights were violated by failing to give State's jury instructions Nos. 1, 2 and 4 were barred due to the fact that he failed to allege the denial of a constitutional right and further due to the fact that they had all been previously and finally adjudicated.

J.     Whether the Circuit Court erred by finding that Petitioner's claim that his constitutional rights were violated due to the denial of his bill of particulars as being previously and finally adjudicated.

K.     Whether the Circuit Court erred by finding that Petitioner's claim that his constitutional rights were violated due to the denial of his motion to dismiss was barred as being previously and finally adjudicated.

L.     Whether the Circuit Court erred by finding that Petitioner's claim that his rights were violated by the State's failure to timely provide discovery and provide him with a speedy trial were barred as being previously and finally adjudicated.

M.   Whether the Circuit Court erred by finding that the Petitioner's claim that his rights were violated due to the victim's wife testifying as to how the crime had affected her family were barred as not alleging the denial of a constitutional right and also as being previously and finally adjudicated.

N.   Whether the Petitioner was denied effective assistance of counsel during the course of his habeas corpus petition in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution.

O.   Whether the Circuit Court erred by not granting the Petitioner's motion to hire expert witnesses on the issue of intoxication, ballistics, and DNA in violation of the Petitioner's Due Process rights under the Constitutions of the United States and West Virginia.

(Id.)  The SCAWV refused the Petition for Appeal on February 15, 2007.  (Id.)

### The instant federal habeas corpus petition

Petitioner, acting pro se, filed the instant Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 on April 17, 2007, asserting the following 12 grounds for relief:

**Ground One:**  The Petitioner was clearly denied effective assistance of trial counsel in violation of the First, Fifth and Sixth Amendments to the United States Constitution and it violates Article III, Sections 10 and 14 of the West Virginia Constitution.

**Ground Two:** Petitioner maintains his life sentence is not supported by clear and convincing evidence.  The evidence at best would have supported a manslaughter and no more than second degree murder charge, not a first degree murder conviction.  This violated the Petitioner's First, Fifth and Sixth Amendments to the United States Constitution and it violates Article III, Sections 10 and 14 of the West Virginia Constitution.

11

**Ground Three:** The Court violated Petitioner's constitutional rights by allowing any alleged evidence or statement to be presented before the jury as they were the product of illegal arrest.  Petitioner was denied his right to be promptly taken before the magistrate in a timely fashion which led to an illegal arrest and seizure of illegal evidence.  The Petitioner was denied his right to be taken promptly before the county magistrate upon probable cause by city police to arrest the Petitioner at 2:09 a.m. on July 7, 1998.  Every act from this point was clearly an act to obtain incriminating information against his will.  This violated the Petitioner's First, Fifth and Sixth Amendments to the United States Constitution and it violates Article II, Sections 10 and 14 of the West Virginia Constitution.

**Ground Four:** The Petitioner's rights were violated when the court imposed two separate charges from one single act which violated Petitioner's rights to the Double Jeopardy standards.  This violated Petitioner's First, Fifth, Sixth Amendments to the United States Constitution and it violates Article III, Sections 10 and 14 of the West Virginia Constitution.

**Ground Five:** Petitioner was denied a fair trial when the Court entered into evidence items seized from Petitioner's home subsequent[] to an illegal search and seizure of said home.

**Ground Six:** Petitioner was denied a fair trial because of prosecutorial misconduct from the opening statements throughout trial and in his closing argument, all of which violated Petitioner's right to a fair trial.

**Ground Seven:** The Petitioner's rights aforesaid were violated because of the States's use of testimony they knew or should have known was perjury.

**Ground Eight:** The Petitioner's constitutional rights were violated when the Court failed to give Defendant's jury instruction No. 5 relating to unlawful discharge of a firearm based on the testimony of the defendant, his only defense being accidental discharge of his firearm.  Such denial violated the Fifth, Sixth and Fourteenth Amendment[s] to the United States Constitution and Article III, Sections 10 and 14 of the West Virginia Constitution to a fair trial.

**Ground Nine:** Whether the Circuit Court erred by finding that Petitioner's claim that his constitutional rights were violated by failing to give State's jury instructions Nos. 1, 2 and 4 were barred due to the fact that he failed to allege the denial of a constitutional right and further due to the fact that they had been previously and finally adjudicated.

**Ground Ten:** The Petitioner's rights were clearly violated when the Court denied Petitioner's Motion for a Bill of Particulars.

**Ground Eleven:** The Petitioner's constitutional rights were clearly violated when the Court denied Petitioner's Motion to Dismiss, said motion being made upon the grounds that the State failed to disclose witness statements agreed to be supplied to the defendant in exchange for waiving the preliminary hearing.

**Ground Twelve:** The Trial Court abused its discretion in admitting testimony by the victim's spouse that detailed how her family had been affected by the crime allegedly perpetrated by Petitioner.

(# 1).

On August 24, 2007, Respondent filed an Answer (# 9), a Motion Motion for Summary Judgment (# 10), a Memorandum of Law in support thereof (# 11), and exhibits in support thereof (## 12, 13 and 14). On August 29, 2007, Petitioner filed a "Motion for Enlargement of Time to File Response/Reply," in which he sought a period of 60 days to file a response to Respondent's Motion for Summary Judgment (# 15). On August 30, 2007, the undersigned entered an Order granting Petitioner's Motion for Enlargement of Time and, pursuant to the holding in Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Petitioner of his right to respond to Respondent's motions and setting deadlines for the response and a reply brief.

(# 27).

On October 18, 2007, Petitioner filed a "Reply in Opposition to Respondent's Counsel's Memorandum of Law in Support of Respondent's Motion to Dismiss and for Summary Judgment" (# 17) (hereinafter "Petitioner's Response").  Except where specifically discussed herein, Petitioner's Response essentially reiterates the arguments made in Petitioner's federal petition.  Therefore, the undersigned will not repeat those arguments.

Respondent did not file a reply brief.  This matter is ripe for determination.

## FACTUAL BACKGROUND AND TRIAL TESTIMONY

The following facts are derived from testimony taken at Petitioner's trial:

Petitioner and his ex-wife Wanda Johnson (who still lived with him, despite their divorce years earlier), resided at 1005 Camden Avenue in Parkersburg, West Virginia.  Everett and Teresa Coleman and their three children, Jason, Troy, and Salina, lived next door at 1003 Camden Avenue.  Michael and Patricia Mollohan and their two children, Nicole and Lucas, lived across the street at 1004 Camden Avenue.  Shortly after 1:00 a.m. on July 7, 1998, Teresa Coleman was shot and killed and Michael Mollohan was hit by another gunshot and was permanently maimed and blinded.  Petitioner was arrested for the crimes.

14

At Petitioner's trial, testimony was taken from various witnesses, including the Colemans, Nicole Mollohan, Michael Mollohan, Patricia Mollohan, Roy Goodnight, and Wanda Johnson, all of whom were in the immediate vicinity at the time of the shootings. The testimony demonstrated that the Colemans and the Mollohans, who had family and friends visiting, were socializing outside their homes for the majority of the evening of July 6th and into the early morning hours of July 7th. The various witnesses testified that, at some point in the evening, the Coleman children were playing with a recreational exploding device called a "potato gun," which made a lot of noise.

According to Petitioner's own testimony, and that of Wanda Johnson, Petitioner came home from a long day of working on some home repairs at his brother's house, and sat down to watch television. Wanda Johnson testified that she went to bed around 9:30 p.m., and laid in bed for about an hour before she fell asleep. (# 13, Ex. 10 at 6-7). She was later awakened when Petitioner turned on the light and grabbed a gun case and laid it on the bed. (Id. at 7). When Wanda asked him what he was doing, Petitioner stated, "I called the police about twenty minutes ago. They wouldn't come. I'm going out to quiet them up." (Id.) Wanda testified that she thought he meant two of the neighbors, or the dogs. (Id. at 7-8). Wanda stated that Petitioner unzipped the gun case, removed the gun and left the bedroom. (Id. at 8-9).

15

Wanda stated that she got up and put on a robe and followed Petitioner. By that time, Petitioner was already outside, and he was squatted down on the driver's side of his truck. The gun was laying on the ground. (Id. at 12-13). Wanda testified that she tried to grab the shotgun, and suggested to Petitioner that they call 911. He replied, "Get the f— out of here and go back in the house." (Id. at 13-14).

Wanda further testified that she went back into the house and tried to call 911, but got no answer. (Id. at 13). Then she heard two shots. (Id. at 13-15). She called 911 again and, at that time, they said they had already heard about the gunshots. (Id. at 13). When Wanda went back outside, she saw Petitioner run around the corner of their house. (Id. at 13-14). She then went down and grabbed the gun and put it underneath her car. (Id.) She said she saw people outside both of the neighbors' houses at that time. (Id. at 14).

The Coleman children and the Mollohans all testified that, sometime around 1:00 a.m., a police officer arrived and spoke to Teresa Coleman and asked her to take her family inside for the night, due to a noise complaint. Although the children had gone inside, Teresa sat outside her house and talked to someone on the telephone. Across the street, Nicole Mollohan sat outside her house with two of her friends, Roy Goodnight and Nathan Rollyson. According to Michael Mollohan, he had just come outside to tell

16

Nicole to come in for the night, when he heard a blast and saw
Teresa Coleman go down to the ground. (Id. at 207). He yelled her
name, and then told the kids to go inside, when he got shot, and
fell backwards onto Nicole. (Id. at 207-208). Michael was hit on
the right side of the face, causing permanent damage and blindness
in both of his eyes. (Id. at 211-212).

Jason Coleman, Teresa's son, heard two shots and went outside
to find his mother laying on her back with her head towards their
house. (# 13, Ex. 9 at 59-61). He ran back inside and woke up his
father, Everett, who was asleep on the couch, screaming, "Mom's
been shot!" Jason testified that, when he went back outside, he
saw a car up the road and thought maybe it had been a drive-by
shooting. (Id. at 63). However, his brother, Troy, told him that
he saw somebody over by the Johnsons' house. (Id. at 64-65).
Jason testified that he looked over to the Johnsons', but didn't
see anybody at that time. (Id.) Later (although he wasn't sure
how long), he saw somebody running, but he couldn't make out who it
was, as it was just a shadow. He thought that the person was
wearing a hat. (Id. at 65-66).

Jason further testified that he ran inside and grabbed one of
two guns that they had in the house; although, apparently, neither
gun worked. (Id. at 67). When the police arrived, they told Jason
to put the gun down. He took the gun back inside. (Id. at 68).
That gun was never seized, and was never thought to have been

involved in the shootings.  (Id. at 67).

Troy Coleman testified that, when he went outside, after hearing two shots fired, he saw Petitioner back behind his red Ford truck, aiming a gun at them.  (Id. at 89, 92).  He testified that the gun was a 12 gauge double-barrel shotgun.  (Id. at 92).  Troy further stated that Petitioner was wearing a camouflage hat and blue jeans.  (Id. at 94).  Troy stated that he saw Petitioner run back behind his house.  (Id. at 92).  As soon as the police arrived, Troy told them what he had seen.  (Id. at 118).

Troy gave conflicting testimony concerning the number of shots he heard.  First, he testified that it was two shots.  (Id. at 89).  Later, he said it was two or three.  (Id. at 94).  He also stated that he did not see a scope on the gun.  (Id. at 119).

Salina Coleman testified that she was in her bedroom, when she heard two shots.  She came out of her room when she heard Jason yell that their mother had been shot.  (Id. at 125-126).  Everett Coleman was sleeping on the couch, and assumed that the sounds that he heard were fireworks, until Jason woke him up.  (Id. at 142, 147).  Everett also testified that he sent Jason in to get a rifle from his bedroom, and that Jason stood on the porch with the rifle, until the police arrived and told him to put the gun down.  (Id. at 147-148).

Roy Goodnight testified that he saw someone, whom he could not identify, with a shotgun in Petitioner's front yard.  (# 13, Ex. 10

18

at 170-171).  He stated that he heard a gun shot and saw Teresa
Coleman fall to the ground, just after she stood up from being on
a phone call and had turned around to go inside.  (Id. at 170,
176).  Then, he looked over and saw the person with the gun, aiming
it at them, so he ducked down.  (Id. at 171).  He then heard a
second shot, and glass breaking, and then he saw that Michael
Mollohan had been shot.  (Id. at 171-174).  He helped move Michael
inside the Mollohan house and he remained there until the police
arrived.  (Id.)

Nicole Mollohan testified that she heard three gun shots.
(Id. at 190-191).  Nicole further testified that the shots came
from the Johnsons' yard, but she did not state whether she saw the
shooter.  (Id. at 195, 201).  Nicole also testified that Teresa
Coleman was facing away from them, and towards her house, at the
time she was shot.  Thus, the shots came from her left side.  (Id.
at 195, 200-201).

Patricia Mollohan testified that she had been sleeping, and
got up for something.  Just as she got back into bed, at 1:13 a.m.,
she heard a loud boom and glass breaking.  (# 13, Ex. 10 at 147-
149).  She went out to the living room and learned that her husband
had been shot, so she called 911.  (Id. at 150-151).

The Colemans and the Mollohans all testified that they were
not aware of any problems between their family members and the
Johnsons, and that they had virtually no interaction with the

19

Johnsons.

The jury also heard testimony from the various police officers and detectives who were involved in the investigation of the crimes and the apprehension of Petitioner.  Officer Justin Elliott, who was the officer who responded to the earlier noise complaint, was one of the first officers on the scene.  (# 13, Ex. 9 at 193-194). He stated that, at approximately 1:22 a.m., they got a call that shots had been fired and possibly two people had been shot.  (Id. at 194).  He testified that, when he arrived, "there were people running around, people yelling, yelling, you know, people have been shot."  (Id. at 195).  He went into the Coleman's yard and saw that Teresa Coleman had multiple gunshot wounds to her upper torso, chest and head.  (Id.)  He recognized her as the woman with whom he had spoken.  (Id. at 196).  He stated that, as he walked up to the Colemans' house, a juvenile came out with a gun, and he told him to put the gun down.  The boy ran back into the house and put the gun down.  Officer Elliott stated that the gun was not a shotgun. (Id.)

Lieutenant Jeffrey Dyke (hereinafter "Lt. Dyke"), who was the shift commander that night, arrived at about the same time as Officer Elliott.  Lt. Dyke testified that, when he arrived, he spoke to the Colemans, who stated that the shots came from the area of Petitioner's house.  He then instructed Officer Elliott to watch the front of Petitioner's house to make sure that no one entered or

exited the house.  (Id. at 156-157).

Lt. Dyke further stated that, after the paramedics arrived, he turned his attention to the Johnsons' house.  He saw Wanda Johnson on the front porch, and asked her to come down off the steps.  (Id. at 177-178).  Lt. Dyke stated that Mrs. Johnson was reluctant to talk to him, but she eventually told him where the gun was located. (Id. at 178).  Lt. Dyke subsequently placed Mrs. Johnson in his cruiser because he did not want her to go back into the house. (Id.)  Lt. Dyke noted the location of a single-barrel shotgun underneath a car, and two spent shell casings on the ground near a red truck in the Johnsons' yard.  (Id. at 159-168).  Lt. Dyke testified that the shotgun had a scope on it, and some camouflage on the barrel.  (Id. at 167).

During this time period, Lt. Dyke directed Officer Todd Lambiotte to secure the Johnsons' residence.  (Id. at 230-231). Officer Lambiotte testified that he went up on the porch and stood in a corner where he could observe both the front and side doors. (Id. at 231).  After about ten minutes, Lt. Dyke came up and they performed a "protective sweep" of the house.  (Id. at 231). Officer Lambiotte testified that he and Lt. Dyke searched the entire living area of the house and determined that Petitioner was not inside.  (Id. at 234).  He further stated that he observed a box of live shotgun shells on a coffee table in the living room, and a shotgun case on a bed, but neither of those items were seized

21

at that time.  (<u>Id.</u> at 232-236).

Lt. Dyke testified that he did not recall seeing any weapons or ammunition in the house.  (<u>Id.</u> at 180).  Lt. Dyke further testified that he and Sergeant McCune went back into the house and performed a second "protective sweep."  No evidence was seized at that time, either.  (<u>Id.</u> at 182-183).

By this time, Officer Blaine Ritchie had arrived with a canine to track the suspect.  Lt. Dyke stated that he believed they took a shoe or something of Petitioner's from the house for the canine to track Petitioner's scent.  (<u>Id.</u> at 183).  Lieutenant Dyke then moved Officer Elliott to the back of the house and assigned Sergeant McCune and Officer Lambiotte as backup to Officer Ritchie and the canine.  (<u>Id.</u> at 157-159).

Petitioner was apprehended in an alley down the street from his house.  He was wearing blue jeans and no shirt, and had a laceration over his right eye and the area below his right eye was bruised.  Officer Lambiotte went back and brought a cruiser to pick up Petitioner, so as not to return him to the location of crimes.  (<u>Id.</u> at 239-240).

As the officers were walking Petitioner to the cruiser, Officer Elliott heard Petitioner make the following unsolicited statement:  "They were stealing me blind.  It's a shame you son of a bitches wouldn't do anything about it, so I had to take matters into my own hands."  (<u>Id.</u> at 204).  Officer Elliott testified that

Petitioner smelled of alcohol.  (Id. at 226).

Officer Lambiotte testified that Petitioner also stated, "I got two of them, but I got the wrong ones" and "I would like to do to you what I did to them."  (Id. at 243).  Officer Lambiotte stated that, once he was in the cruiser with Petitioner, he could smell alcohol, but stated that Petitioner did not appear to be intoxicated.  (Id. at 244-245).  In fact, Officer Lambiotte testified that he would not have arrested Petitioner for public intoxication based upon his demeanor.  (Id. at 260-61).

Officer Lambiotte further testified that, as they were making the trip to the police station, Petitioner made the following unsolicited statements, which he wrote down on a notepad in his cruiser: (1) "You would not help me, so I done it myself;" (2) "I really caused some action;" (3) "Nice response time.  You never come out when I need you;" (4) "I could only take so much and I could not take anymore;" and (5) "I'm gonna get you."  (Id. at 246-47).

After Petitioner was taken into custody, Lt. Dyke turned over the investigation to Detective Robert Bargeloh.  (Id. at 183). Detective Bargeloh assisted Detective Kenneth Miller in photographing and collecting the evidence, which included the shotgun, the spent shell casings, the gun case, and the box of live shotgun shells found on the living room coffee table.  (Id. at 285-304; # 13, Ex. 10 at 109-117).  The box of live shotgun shells was

23

submitted to the West Virginia State Police Forensic Lab to be compared to the spent shell casings found outside Petitioner's home.

Before trial, Petitioner's counsel filed a motion to suppress the evidence seized from inside Petitioner's home on the basis that it was seized during a warrantless search.  On July 19, 1999, the trial court heard testimony from Officer Elliott and Detective Miller about the searches of the Johnson home and the seizure of evidence therefrom.

During the suppression hearing, Detective Miller testified that, when he arrived at the scene, he was briefed by Detective Bargeloh and Lt. Dykes.  Detective Miller stated that, at the time, he believed Petitioner was still at large.  He further stated that he went up on the porch of Petitioner's house, looked in the open front door, and saw a box of shotgun shells on the coffee table. He then went in to secure those shells.  (# 18, Ex. 18 at 46-47).

Officer Elliott also testified at the suppression hearing about their receipt of consent to search the house from Wanda Johnson.  (Id. at 34-35).  Officer Elliott also stated that he could see a box of shotgun shells in plain view from the front porch.  (Id. at 35-36).

The trial court denied Petitioner's motion to suppress, finding that Wanda Johnson had given them consent to search the house, that the shotgun shells and gun case were found in plain

view, and that these items were subsequently seized during another search of the house, while Petitioner was still thought to be at large.  Thus, the court found that there were exigent circumstances to support the seizure of the evidence.  (# 14, Ex. 12).

During Detective Miller's trial testimony, Petitioner's counsel renewed his motion to suppress this evidence, on the basis that Detective Miller had changed his testimony, indicating that he went into the house to seize the evidence, not to conduct an additional protective sweep.  (# 13, Ex. 9 at 296-298).  The motion was again denied.  (Id.)

After Petitioner arrived at the police station, he was advised of his Miranda rights and he signed a waiver form.  (# 13, Ex. 10 at 92-94).  He was then interviewed by Detective Decker Moody.  Detective Robert Bargeloh was also present for the interview.

Detective Moody testified that, on several occasions, Petitioner stated that he understood his rights, and agreed to answer questions, but he refused to give a taped statement.  (Id. at 94).  The interview lasted about one hour.  (Id. at 95).  Detective Moody stated that he did not take notes, but Detective Bargeloh did.  (Id.)

Throughout the interview, the detectives did not advise Petitioner of the status of either victim.  At trial, Detective Moody testified that they did not inform Petitioner that Teresa Coleman had died because they "felt that he would not be willing to

cooperate if he knew that someone had died." (<u>Id.</u> at 102).

Detective Moody summarized Petitioner's statement as follows:

Q.   Would you relate what Mr. Johnson told you that morning?

A.   He stated that his neighbors had been outside on the porch causing a lot of noise.  He said that the kids were letting off what he referred to as "booms" and just generally disturbing him.  He stated that he had called the police and that when the police arrived, the kids had went inside, and when the police left, the kids came back outside and again began making noise and disturbing him.

He said that he was outside when he heard Teresa Coleman say "We got the police called on us again and I know who called."  He said that it was in a taunting manner and he said that he felt like he must have just snapped; said that he thought he had a BB gun and that he didn't mean to hurt anyone, he just wanted people to leave him alone.

Q.   Is that essentially the extent of the conversation that you remember being present at?

A.   Yes.  He had indicated also that he felt that the police had let him down.  He said that since the Fifth Street Bridge had been closed - because, at that time, there was work being done on the bridge and it was closed - that he felt that he wasn't getting the service from the police department that he should have.

(<u>Id.</u> at 96-97).

Detective Bargeloh summarized his recollection of the interview as follows:

Q.   Would you relate to the jury the sum and substance of the conversation that you had with Mr. Johnson the morning of July 7th, 1998, concerning the shootings in the ten hundred block of Camden Avenue?

A.  Yes.  After I explained to Mr. Johnson that I
wanted to discuss the shooting that occurred at his
residence earlier in the morning, I asked him what
caused that or what was - what led up to that, and
he indicated to me noisy kids in the neighborhood.
He indicated that they had a barrel with fire in it
and booms, there were booms going off.

And I said who are these people that was doing this
and he said they're neighbors that were across the
street from his house and beside him.   And he
indicated 1003 and 1004 Camden Avenue.   He
indicated further that they were out on the
porches, noisy talking, loud, fighting, disturbing
him.

I asked him if he had contacted the parents of the
people who were disturbing him and he indicated
that the parents would not help, nor control their
children.   I asked him if he had called the police
regarding these problems and he indicated that yes,
he had called the police, he had talked to the
police department, and on this particular night, he
was transferred to the fire department and the fire
department didn't respond at all.

Then I asked him, well, what happened?   How did
this shooting take place?   And he indicated to me
that he was sitting outside by his truck and that
the lady next door, the mother started yelling, "We
got the police called on us again and we know who
called."   And when she said that, he indicated that
he must have just snapped, and it wasn't really
what she had said, but basically the way she said
it, and he described it as taunting him.

And then he indicated that - - he went and said, "I
don't really remember.   I think - - I don't want to
hurt anyone.   I want everyone to just leave me
alone.   I leave them alone.   Why can't they leave
me alone?"   He also indicated, "I don't f---- with
them.   Why won't they leave me alone?   They always
throw it in my face.   I just want to be left alone.
I didn't want to hurt anyone, but they wouldn't
stop taunting."

I asked him how long this had been going on.   He
indicated that he had left town for a period of

27

weeks working, and during that time, that seemed to
help.   Said after three or four days, he really
felt better, and then when he came back home, all
the sh-- started again.   Actually, he said it
started before he went out of town, and he
mentioned Elyria, Ohio.  And after he was there, it
really settled down, or he really settled down, but
said when he came back again, he had the same
problems - taunting and mouthing.

I again asked him specifically about the shooting
on that morning and he indicated that he didn't
mean to hurt anyone tonight, everything just
happened so quick.   "I called you guys and I didn't
get any response."  He told the cops a thirteen and
fourteen year old in the parking lot was setting
off fireworks.   Before the cops came, they went
inside, and then they go right back to it after the
cops leave, raising hell.   He said, "I called the
cops on Saturday, Sunday and Monday, and since the
Fifth Street bridge was closed, we get nothing on
south side."

I again asked him to be specific and I asked him
what happened tonight, why did the shooting occur
tonight, and he indicated he thought he had a BB
gun outside and, "I hope I didn't hurt those
people.  There's just no hope for me now.  You just
don't understand me at all."  He also indicated to
me as I was questioning him that he hoped he didn't
hurt that lady, but he had gotten the wrong one, he
should have gotten the kids.

(Id. at 125-128).

On August 9, 1999, a pre-trial hearing was held concerning the
admissibility of the statements Petitioner made to Officer
Lambiotte, and those made while Petitioner was being interrogated
at the police station.   Officer Lambiotte and Detectives Bargeloh
and Moody testified at the hearing.   Their testimony was
substantially similar to that summarized above.

Officer Lambiotte stated that Petitioner's statements in his presence were unsolicited.  He said that, although he did not read Petitioner his <u>Miranda</u> rights, he did not ask Petitioner any questions or respond to him in any way.  (# 18, Ex. 18 at 71-72, 79).  The testimony concerning Petitioner's statements was found to be admissible.  (# 12, Ex. 7 at 15).

At trial, both Detectives Moody and Bargeloh also testified that, in their opinion, Petitioner was not intoxicated, and appeared to understand what was going on.  (# 13, Ex. 10 at 92, 121, 131-132).  In fact, Detective Bargeloh described the reasons he believed that Petitioner was not intoxicated:

> A.   No.  I was convinced that he wasn't.  There's a couple of factors that helped me gather that information.
>
> * * *
>
> A.   One of them being that he had the presence of mind to tell me prior to talking with me that he didn't want a tape recorder on.  It's been my experience with drunk or intoxicated people that that probably wouldn't have been an issue; they wouldn't have had the presence of mind to wonder whether we was gonna tape record the statement or not.
>
> Mr. Johnson certainly did not act drunk.  He was coherent, and when I asked him a question or addressed him, he looked me in the eye and – – or Detective Moody in the eye and answered our questions.  When we went over the rights waiver, it was very clear that he understood what his rights were, and as I indicated, when we were done with the rights waiver and indicated that we wanted to talk to him and interview him, he then said that he didn't want a tape recorder.

> So, based on that, I felt that he was not
> intoxicated and I didn't see a need for a breath
> test to determine that.

(<u>Id.</u> at 132).

On cross-examination, the detectives admitted that they never specifically asked Petitioner if he shot anyone, and they did not inform Petitioner that Teresa Coleman was dead, or that Michael Mollohan was seriously wounded.  (<u>Id.</u> at 129).

The State also offered the testimony of Chief Medical Examiner James A. Kaplan, M.D., who testified about the autopsy performed on Teresa Coleman.  Dr. Kaplan testified that Teresa Coleman died as a result of being struck on the left side of the head, face, neck and chest by a number of shotgun pellets.  There were pellet wounds to the side and back of her left upper arm in a pattern consistent with her having raised her arm in a defensive posture.  (# 13, Ex. 9 at 267-270).

The State also offered the testimony of Stephen King, a Latent Fingerprint Examiner with the West Virginia State Police Forensic Lab, who stated that there were no identifiable fingerprints on the shotgun or the spent shell casings.  (<u>Id.</u> at 331).  Trooper Roger R. Reed also testified that, after comparing the spent shotgun shell casings with the live shotgun shells removed from Petitioner's house, he was of the opinion that they were of the same type and same label.  (<u>Id.</u> at 351).  Trooper Reed further testified that he believed that the spent shell casings had been

"cycled through" the seized shotgun, but he could not express an opinion as to whether they had been fired from that shotgun. (<u>Id.</u> at 343-344).

The State also presented the testimony of Soraya McClung, a biochemist with the West Virginia State Police Forensic Lab, who testified that, after comparing Petitioner's blood sample to the blood found on the scope of the seized shotgun, the DNA in the blood on the shotgun could have come from Petitioner. (<u>Id.</u> at 397-398). The fact that Petitioner's blood was on the scope of the gun was not in dispute.

Sergeant John Giacalone also testified that a gunshot residue kit performed on Petitioner, once he was at the police station, was negative for trace evidence that he had discharged a firearm prior to his arrest. (<u>Id.</u> at 409-417).

In Petitioner's case in chief, he offered the testimony of a number of character witnesses, who testified that Petitioner had a reputation as a peaceable, non-violent person. Petitioner also offered the testimony of Michael and Mitchell Barton, two brothers who lived down the street at 1101 Camden Avenue.

Michael Barton testified that, on the night in question, he heard three shots coming from down the hill to his right - toward the Johnson house, which was four houses down from his. (# 14, Ex. 11 at 111, 128). He said he went outside to see what had happened and he heard a female scream, and then he saw somebody, who

31

appeared to be a young male wearing a dark shirt, run across the street from right to left, and go between two buildings, and then he saw the same person running back again.  (Id. at 111-112).  He could not identify the person, as it was just a silhouette.  The person did not appear to be carrying a weapon.  (Id. at 130).

Michael further testified that there was about 5-6 seconds between the first and second shots, and about 5-10 seconds between the second shot and the third.  (Id. at 125-126).  Michael stated that, a little later, he and his brother watched the police walking Petitioner down the road.  Michael said that he heard Petitioner say, "You guys don't do anything until I take matters into my own hands."  (Id. at 115).  Michael stated that he had never met Petitioner or any of the people involved in this incident.  (Id. at 131).

Mitchell Barton testified that he heard three strange noises, and wasn't sure what they were.  (Id. at 135).  He went outside, and he heard a scream.  (Id. at 136).  He also saw an individual, who appeared to be a young male, run from right to left across Camden Avenue, and in between a body shop and an apartment building.  (Id. at 137).  A few minutes later, the person ran back across the street, in front of the Johnsons' house.  (Id. at 137-138).  He did not see the person again.  (Id. at 138).

Mitchell then went back to his room, until he heard the police walking down the road with Petitioner.  (Id. at 140).  Mitchell

32

stated that it did not appear that Petitioner was having any trouble walking. (Id. at 141). Mitchell testified that he heard Petitioner say, "It doesn't matter. I'm going to die anyway." (Id. at 142). Mitchell testified that there was about 10 seconds between the first noise he heard and the second, and about 5-10 seconds between the second and third. (Id. at 145). Both Michael and Mitchell stated that, when the police arrived, they heard an officer say "Put the gun down." (Id. at 123-124, 139).

Petitioner also offered the testimony of Robert White, as an expert witness on ballistics, firearms, and gun residue analysis. Mr. White testified that, if Petitioner had not washed his face and hands within four hours, one could expect to find gunshot residue on them. Mr. White further testified that the absence of gunshot residue could mean either that Petitioner did not fire a gun that night, or that Petitioner had washed his hands or acted in a way to remove gunshot residue. (# 14, Ex. 11 at 28).

Petitioner's counsel also asked Mr. White about the location of the pellets that were found in the victims and around the areas where they were shot. Based upon testimony, pictures, a visit to the scene, and the autopsy report, Mr. White opined that Teresa Coleman had to have been facing the street at the time she was shot, in order for the shot to have come from the Johnsons' yard. Mr. White stated that, in order to inflict the wounds Teresa Coleman received, if she were facing her house, as Michael Mollohan

33

had testified, the shots had to have come from the street.  (Id. at 31-32).  Mr. White also indicated that the shot marks on the Coleman's house were located high on the house, which would be consistent with the theory that the shooter was shooting in the air.  (Id. at 32).

Petitioner also offered expert testimony from James Debrular, a surveyor, who testified about the distance between Teresa Coleman's alleged location at the time she was shot, and the location where the shell casings were found.  Mr. Debrular testified that the distance between those two points was 44 feet. (Id. at 53-54).

Petitioner also offered the testimony of Parkersburg Police Officer Danny McCullough, who testified that, around 6:15-6:30 a.m., on the morning of July 7, 1998 (that is, approximately five hours after Petitioner could have had his last drink), Officer McCullough was directed to take Petitioner to the Camden Clark Memorial Hospital for medical treatment for the wound to his forehead and eye.  Officer McCullough testified that, when he came in close contact with Petitioner in the elevator, he could "smell [alcohol] very plainly."  (# 14, Ex. 11 at 204-206).  On cross-examination, however, Officer McCullough indicated that Petitioner did not have any trouble walking or communicating with him.  (Id. at 207-208).

Petitioner testified at his trial.  He stated that, after injuring his back some years before, he had been self-medicating by drinking alcohol at night to ease the pain and help him sleep. Petitioner testified that, on the night in question, he came home around 6:00 p.m., and was in a lot of pain.  (Id. at 254).  He received several phone calls about additional work he was going to do for family and friends.  (Id. at 256-258).

After Wanda went to bed, around 9:45 p.m., he started drinking whiskey, with an orange juice chaser, and was watching television. (Id. at 258-259).  At some point, he heard two blasts and looked out the window and saw a fire in a barrel in the Colemans' yard. (Id. at 259-260).  He saw two boys throw something in the fire and then there was another blast.  (Id. at 260).

Petitioner said he called 911 to complain and he was connected to the fire department.  (Id. at 260-261).  Petitioner stated that he did not hear the potato gun being fired earlier that night because that was going on in the front yard, and his house is "set back."  (Id. at 261).  Petitioner stated that he did not know that the police had responded to the call.  (Id.)

Petitioner said that he also heard something that sounded like someone was dragging something off of his porch, so he lunged forward in his chair.  (Id. at 261-262).  He then testified that he did not remember anything else until he was leaning on the bed of his truck looking down Camden Avenue.  (Id. at 262).

35

Petitioner stated that the last time he remembered firing his gun was on April 22nd, the Sunday before turkey season. That day, he was hunting with his friends, the Yeagers, and he test-fired the gun. (<u>Id.</u> at 263-264). Petitioner stated that the gun recoiled and injured his head, and he did not fire it again that day. (<u>Id.</u> at 264-265). Petitioner also talked about the type of shotgun shells he used that day, and stated that he must have left some shells in the shotgun. (<u>Id.</u> at 285-286).

Petitioner further testified that, when he came to on the night of the incident, he saw Wanda in the doorway, and everything else was quiet. (<u>Id.</u> at 265-266). He stated that, as he stepped forward to return to the house, he stepped on the gun. (<u>Id.</u> at 266). Then, he testified that, when he reached down to pick up the gun, he heard someone say something off to his left and he was shocked and stood the gun up in front of him and turned and looked to his left. (<u>Id.</u> at 266-267). He said he saw Teresa Coleman's head appear over the hill, walking toward him, and then she turned to the left and went up onto her porch and into her house. (<u>Id.</u> at 267). He said, as soon as she went into the house, he raised up and realized he was outside with a gun when he shouldn't have been. (<u>Id.</u> at 267).

Petitioner said he was crouching down because he didn't want to hit the mirror on his truck. (<u>Id.</u> at 268). He claimed that, as he stepped with his right leg, his knee buckled, and he fell down

36

and the gun "exploded."   (Id.)   He said as he tried to get up again, the slide on the gun fell down, and as he leaned against the truck to push himself up, "the back of the gun shot straight up out of my hand, almost jumped out of this one.  The gun jumped in the air and it fired again."  (Id. at 268-269).  He said the gun then flew back and hit him again in the face. (Id. at 269).  Petitioner further testified that, at the instant that all happened, he "hit chest to chest with somebody," but he doesn't know who it was. (Id.)

Petitioner stated that he remembered struggling with someone, but doesn't remember his wife coming out and trying to take the gun away. (Id. at 295-296).  He said when the second shot happened, it was like someone grabbed the gun, but he didn't see anyone.  (Id. at 307).  Petitioner testified that he had consumed almost all of the fifth of whiskey, and that he believed he was intoxicated that night.  (Id. at 270).

Petitioner stated that he did not remember anything else, other than the moment the police officers took him into custody. (Id. at 272-274).  Petitioner further stated that he had no memory of the statements he made to police as they walked him to the cruiser, or in the cruiser on the way to the police station.  (Id. at 314-315).

Petitioner did have a recollection of the interview with Detectives Bargeloh and Moody.  He admitted that he was read his

37

<u>Miranda</u> rights.  (<u>Id.</u> at 275-276).  He claimed that he asked for a
lawyer, but he continued to answer questions anyway.  Then,
Petitioner stated that he didn't remember half of what was going
on.  (<u>Id.</u> at 276; 318-319).

During his cross-examination, Petitioner stated that he did
not know if he killed Teresa Coleman, but if he did, it was the
result of an accidental discharge of his gun, and not because he
was drunk, and that he had no intention of hurting anyone.  (<u>Id.</u> at
324).  He reiterated this testimony concerning the shooting of
Michael Mollohan.  (<u>Id.</u> at 325).  He then stated that his level of
intoxication may have had something to do with his lack of
coordination that night.  (<u>Id.</u> at 325-326).

The omnibus hearings

The first of two hearings on Petitioner's state habeas corpus
petition was conducted on January 18, 2005.  At that hearing,
Petitioner was the only witness to testify.  He testified that his
trial counsel should have retained a ballistics expert to testify
about the amount of damage the shotgun would have caused, if it
were fired from the distance where Petitioner was located when the
gun discharged.  (# 14, Ex. 14 at 4).  Petitioner argued that, had
he intentionally aimed the gun, the damage would have been more
severe.  (<u>Id.</u>)  Petitioner stated that he was aware of such
experts, but he did not offer what testimony they would have
provided.  (<u>Id.</u>)

Petitioner further testified that, although he was examined by a psychiatrist or psychologist concerning his competency, his counsel did not retain an expert witness to address the effects of alcohol consumption, in order to raise an intoxication defense. (Id. at 5-7).  He further stated that, every time he wanted to discuss the issue of his intoxication, his counsel "wanted that hushed up," and asserted that Mr. Kiger refused to present an intoxication defense.  (Id. at 14, 20-21).  Petitioner admitted that the amount of alcohol he had consumed and evidence of his alleged blackouts was placed before the jury during his own testimony.  (Id. at 14-17).

Petitioner further testified that, on the first shot, the gun accidentally discharged, and on the second shot, someone else manipulated or fired the gun.  (Id. at 19).  Finally, Petitioner stated that it was Mr. Kiger's decision for him to testify, and that he did not want to testify.  (Id. at 21-22).

Since Mr. Kiger was not called as a witness by Petitioner, the omnibus hearing was continued so that the State could call Mr. Kiger, and so the State could review Petitioner's psychiatric evaluation, as it related to his intoxication defense.  The second hearing was held on June 3, 2005.

At the beginning of the hearing, Petitioner's counsel, Mr. Douglass, renewed Petitioner's motion for the hiring of expert witnesses in the fields of intoxication and firearms.  (# 14, Ex.

15 at 3).  The court pointed out that Petitioner's Petition for a Writ of Prohibition on that issue had been refused by the SCAWV, and that the court saw no reason to alter its previous ruling denying the motion, so the motion was again denied.  (<u>Id.</u> at 4).

The state then called William Kiger to testify.  Mr. Kiger stated that he had spent numerous hours working on Petitioner's case.  He estimated that he had spent between 75 and 100 hours preparing for trial, and that he had spent somewhere between 10 and 50 hours meeting with Petitioner.  (<u>Id.</u> at 7-8).  The testimony then turned to a discussion of the proposed intoxication defense.

Mr. Kiger stated that Petitioner was not portrayed to him as someone with an alcohol abuse problem and that, based upon the facts as he knew them, he did not feel that an intoxication defense was appropriate in this case.  Mr. Kiger stated that he had raised an intoxication defense in other cases he has handled.  (<u>Id.</u> at 11-12).  Mr. Kiger further testified that Petitioner did not request that he consult with a medical expert on intoxication, or hire an expert witness concerning an intoxication defense.  (<u>Id.</u> at 15).  Mr. Kiger stated that his belief was that Petitioner was slightly intoxicated on the night of the crimes.  (<u>Id.</u>)

Mr. Kiger was then asked about the hiring of a firearms expert.  Mr. Kiger stated that he hired Robert White.  Mr. Kiger stated that Petitioner never told him he wasn't doing enough with Mr. White on the firearm issue.  (<u>Id.</u> at 16).  Mr. Kiger further

40

stated that, without reviewing his notes, he could not answer specific questions about whether a firearms expert should have been called concerning the angle of the shots. (Id. at 20-21). He did state that he did not believe that such an expert was necessary because there was not another suspect in the shooting. (Id. at 21).

Mr. Kiger further stated that he was not aware of any witnesses that Petitioner wanted to call that he, or his investigators, Tri-S Investigation, had not talked to. (Id. at 17). In particular, Mr. Kiger was asked about his efforts to track down the "young male" who supposedly ran across the street on the night of the crimes. Mr. Kiger stated that he and Tri-S Investigation tried to determine who the person was, but were not successful. (Id. at 19).

Mr. Kiger was also asked about why he did not hire his own DNA expert to rebut the testimony of Soraya McClung. Mr. Kiger stated that they did not dispute that it was Petitioner's blood on the scope of the gun. (Id. at 19-20).

Mr. Kiger also stated that the only major development or change in his trial strategy came when Petitioner decided to testify. (Id. at 24-25). He stated that he never encouraged Petitioner to testify. (Id. at 32). Mr. Kiger stated that Petitioner changed his mind on the last day of trial and wanted to testify. (Id. at 25-26). During the omnibus hearing, Mr. Kiger

41

stated that was probably a mistake. (Id. at 26). Mr. Kiger further stated:

>    A.   This was a pretty gruesome situation, gruesome in a
>         sense that - - I am always thinking about how is
>         the jury going to see this. Not how do I see it or
>         how does Mr. Johnson see it or how do you see it.
>         Here you have a lady standing or sitting in her
>         front yard who gets shot in the head and killed. A
>         guy across the street sitting on his porch minding
>         his own business gets blinded for life. That is a
>         pretty grim picture.
>
>         Here I have evidence to deal with that is going to
>         be admitted before the jury that Mr. Johnson made
>         some very damaging statements. Whether he made
>         them or not, they are going to be put in front of
>         the jury and I know that. That is going to be
>         before the jury. We have a pretty grim situation
>         here where Mr. Johnson unfortunately said to the
>         police, and that is what I have to deal with, said
>         some unkind things after he was taken into custody.
>
>         My goal in this whole case was to keep Mr. Johnson
>         from getting a life sentence. I did not think that
>         is something that anybody is going to walk away
>         from, from the facts and the evidence. My opinion
>         based on however many years of experience that I
>         had was when this case went to trial, when I got
>         done before he testified, the worst that was going
>         to happen to him was second degree murder. In my
>         opinion, when he changed his mind and decided that
>         he was going to testify, he came across to a jury
>         as untruthful and having no remorse for what he
>         did, and that didn't help.

(Id. at 26-27).

Without reviewing his notes, Mr. Kiger remembered that Petitioner told him he thought he had a BB gun, not a shotgun, but when Petitioner testified at trial, the story changed to something that Mr. Kiger had never heard before. (Id. at 27).

42

On cross-examination, Mr. Kiger was questioned about his fee arrangement of $25,000, and whether it included the costs of expert witnesses.   He stated that such fees were contemplated in that amount.   (Id. at 28-29).   Mr. Kiger was also questioned about whether he was aware of the evidence about the person running across the street, and whether that person was a viable suspect in the crimes, as well as whether Wanda Johnson had ever been considered a suspect.   He stated that he was aware of those things. (Id. at 29-31).

Mr. Kiger was asked if Petitioner had ever told him that the police had beaten him at the time of his arrest.   Mr. Kiger stated that Petitioner "claimed he had been manhandled and pushed and shoved around and they intimidated him."   (Id. at 31).   Mr. Kiger stated that he did not remember whether he had used photographs taken of Petitioner following his arrest to cross-examine the arresting officers on that issue.   (Id.)   Mr. Kiger later testified that there was no corroborating evidence of such an attack on Petitioner.   (Id. at 38-39).

Mr. Kiger testified that "there were a lot of facts in the case that were not totally consistent with the State's presentation and their theory, and I hope that I brought then all out."   (Id. at 32).

43

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the United States Supreme Court held that under the "contrary to" clause, a federal habeas court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.  The Court went on to note that under the "unreasonable application" test, a federal habeas court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's

44

decision, but unreasonably applies that principle to the facts of the prisoner's case.  Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Respondent's motion is entitled a "Motion for Summary Judgment."  However, the Memorandum of Law filed with the motion is entitled a "Memorandum of Law in Support of Respondent's Motion to Dismiss and Motion for Summary Judgment" (# 11).  Respondent does seek the summary dismissal of certain of Petitioner's claims of ineffective assistance of counsel as being unexhausted.

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  See, *e.g.*, Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.)  Petitioner was given a notice, pursuant to the holding in Roseboro v, Garrison, 528 F.2d 309 (4th Cir. 1975), advising him of

his right and obligation to respond to Respondent's motion.   (#
16).

**ANALYSIS**

The undersigned will address Petitioner's other grounds for
relief before turning to his claims of ineffective assistance of
counsel, as raised in Ground One of his federal petition.

**1.   Ground Two - Sufficiency of Evidence.**

In Ground Two of his federal habeas petition, Petitioner
asserts that there was insufficient evidence of premeditation and
deliberation to support a conviction of first degree murder.
Petitioner asserts that there was "no evidence of any ill will,
malice or premeditation with regard to the two victims, other than
Petitioner's statement to his wife that he was going to quite [sic;
quiet] them down, a reference to children who were setting off a
'potato gun.' (Tr. Pg. 7)." (# 1 at 39).

Petitioner further asserts that his "level of inebriation left
him to question any intent, and at best, the jury should have been
charged to return a verdict of second degree murder or
manslaughter. [citations omitted]." (Id. at 40).   Finally,
Petitioner asserts that:

> [T]here is testimony of another individual with a gun at
> the scene. (Tr. Pg. 152).  Further evidence supports
> that Petitioner's hands did not have gun powder residue
> on them (Tr. Pg. 417-418, L. 20-24) and evidence that the
> victim was shot in the side, while the testimony
> established she had her back towards the Petitioner.
> (Tr. Pg. 208, L. 4-7, Pg. 215, L. 5-9).

46

(<u>Id.</u> at 39).

As noted by Respondent, in reviewing the sufficiency of the evidence to support a state criminal conviction on a due process challenge in a federal habeas proceeding, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). (# 11 at 25). The court does not re-try the evidence or re-determine the credibility of the witnesses. <u>See</u> <u>Wright v. West</u>, 505 U.S. 277, 296 (1992); <u>Marshall v. Lonberger</u>, 459 U.S. 422, 434 (1983). (<u>Id.</u> at 25-26).

Respondent argues that:

> The Petitioner sets forth no supporting argument to sustain this claim except his own self serving statements that he had no ill will towards his victims. Petitioner's actions on the night of the crimes indicate otherwise. Likewise, Petitioner's claims directly contradict the testimony at trial. The testimony at trial portrayed the Petitioner as very purposeful on the night of the killings. As noted above, Wanda Johnson testified about Petitioner's deliberate actions on the night of the crimes. After taken into custody the Petitioner said, "You would not help me, so I done it myself . . . I really caused some action . . . I could only take so much and I could not take anymore." (Resp't Ex. 9 at 246). Petitioner also made spontaneous statements to the law enforcement officer who apprehended him at the scene saying "They [referring to his neighbors] were stealing [me] blind; it's a shame you son of a bitches wouldn't do anything about it, so I had to take matters into my own hands." (<u>Id.</u> at 204). A witness saw Petitioner behind a truck "aiming a gun" during the crimes. (<u>Id.</u> at 92).

(<u>Id.</u> at 26). Respondent further asserts that Petitioner's version

of the facts was simply unbelievable and "must have insulted the jury." (Id.)

Respondent also correctly notes that, "in West Virginia, malice, intent and premeditation can be inferred by the use of a gun alone and that is sufficient to make a finding of premeditation." See State v. Will, 122 S.E.2d 742 (W. Va. 1924). (Id.)

The State habeas court found that this issue was previously and finally adjudicated because Petitioner raised it in his "Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial." The court stated:

> In that Motion, trial counsel alleged eight grounds upon which the Motion should be granted. Ground three through Ground eight alleged a view of the evidence in the light most favorable to the State of West Virginia as required by State v. LaRock, 196 W. Va. 294, 470 S.E.2d 613 (1996), as presented by the State in its case in chief was not sufficient to establish the offenses of Murder in the First Degree, Murder in the Second Degree, Attempted Murder in the First Degree, Attempted Murder in the Second Degree, Malicious Assault, and Unlawful Assault. (Tr. T. vol. 1 of 1 pgs. 278-279). A hearing was held on the motion [on] the 24th day of February 2000. After careful consideration of the Motion, briefs submitted by counsel, review of the record and a full hearing, the Court denied Petitioner's "Motion for Judgment of Acquittal or in the Alternative, Motion for New Trial."
>
> The Court finds a decision on the merits was made after a full and fair hearing. The Court further finds Petitioner exhausted his right to appeal by submitting a Motion for Appeal to the West Virginia Supreme Court of Appeals. The Supreme Court denied the Motion for Appeal. Therefore, the Court finds Petitioner's ground is barred in this habeas proceeding as the claim has been previously and finally adjudicated under W. Va. Code § 53-4A-1(c).

(# 12, Ex. 6 at 18).

Based upon a thorough review of all of the evidence presented at Petitioner's trial, the undersigned proposes that the presiding District Judge **FIND** that the prosecution presented sufficient evidence of all of the elements of the offenses of conviction, and that, viewing that evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307 (1979).

The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

   **2.    Ground Three - Violation of prompt presentment rule and involuntary confession.**

In Ground Five of his federal petition, Petitioner asserts that he was allegedly not promptly presented before a magistrate, which he asserts resulted in an illegal arrest and an illegally obtained and involuntary confession.  (# 1 at 41-42).  Specifically, Petitioner's petition states:

      The Petitioner was a suspect by eye witnesses describing him, leading to his arrest within two hours of

49

the initial call at 1:55 a.m. (Tr. Pg. 172 L/15-17).
According to the City Police Officers['] own testimony
and police reports, they knew who did the accidental
shooting at 2:09 a.m. on July 7, 1998, yet with probable
cause to arrest the Petitioner at this point, they
elected not to do so until they could receive a
confession and any further incriminating evidence they
could elicit.   This clearly violated the Petitioner's
[rights under the] Fourth, Fifth and Fourteenth
Amendments to the State and United States Constitutions.

When a suspect is taken from a neighbor's home to a
police car, transported to a police station, and placed
in an interrogation room, this type of station house
questioning is a custodial equivalent to a formal arrest.
See Dunaway v. New York, 422 U.S. 200, 99 S. Ct. 2248,
2256, 60 [L.] Ed. 2d 824, 836 (1979).

Petitioner asserts all alleged confession and
evidence used against him came from the illegal detention
and should have been suppressed and not permitted into
evidence.

The State Supreme Court in the case of State v.
Humphery, 177 W. Va. 264, 351 S.E.2d 613 (1986) held the
prompt presentment rule contained in W. Va. Code 62-1-5
(1965) and Rule 5(a) of the West Virginia Rules of
[Criminal] Procedure is triggered when an accused is
placed under arrest.  Furthermore, once a Defendant is in
police custody with sufficient probable cause for an
arrest, the prompt presentment rule is also triggered.
At this point, the right to counsel under the Sixth
Amendment to the United States Constitution and Article
III § 14 of the West Virginia Constitution attaches.

Petitioner's confession should have been suppressed
because it was not voluntary.  The evidence shows the
Petitioner had, prior to his arrest, drank hard liquor
and had sustained a head injury during his arrest, which
left him unable to think clearly.

(# 1 at 41-42).

In order to be entitled to federal habeas corpus relief,

Petitioner must demonstrate that he is in custody "in violation of

the Constitution or laws or treaties of the United States."   28

50

U.S.C. § 2254(a); see also, Estelle v. McGuire, 502 U.S. 62, 68 (1991); Wainwright v. Goode, 464 U.S. 78, 83 (1983). Violations of state law which do not infringe upon specific federal constitutional protections are not cognizable under section 2254. 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Weeks v. Angeleone, 176 F.3d 249, 262 (4th Cir. 1999)("when a petitioner's claim rests solely upon an interpretation of state case law and statutes, it is not cognizable on federal habeas review").

As noted by Respondent, the prompt presentment rule is a matter of state court criminal procedure. Thus, to the extent that Petitioner's claim rests solely upon an interpretation of state law, it is not cognizable in federal habeas corpus. Estelle v. McGuire, 502 U.S. 62, 465, 481-82 (1976); Weeks v. Angelone, 176 F.3d 249, 262 (4th Cir. 1999). (# 11 at 27).

Respondent also asserts that, to the extent that Petitioner claims that his statements were involuntary, Petitioner was advised of his Miranda rights and voluntarily waived those rights before giving his statement to the detectives. (Id. at 28). Respondent contends that Petitioner has not demonstrated that a coerced confession was introduced at trial. (Id.)

The State habeas court did not specifically address this issue in its order denying habeas corpus relief. In fact, it appears

that the court addressed this issue in conjunction with Petitioner's claim that evidence was seized as the result of an illegal search of his home, and found that these issues had been previously and finally adjudicated through pre- and post-trial motions. (# 12, Ex. 6 at 18-19).

The United States Court of Appeals for the Fourth Circuit has determined that "the phrase 'adjudication on the merits' in § 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." Thomas v. Taylor, 170 F.3d 466, 475 (4th Cir. 2000). When a state court summarily rejects a claim without setting forth its reasoning, the federal court reviews the record and the clearly-established Supreme Court law, but still "confine[s] [its] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.'" Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000).

Based upon Bell v. Jarvis, supra, 236 F.3d at 163, the undersigned proposes that the presiding District Judge **FIND** that the summary refusal of this claim was an adjudication on the merits for purposes of § 2254(d). Therefore, the undersigned proposes that the presiding District Judge **FIND** that the appropriate standard of review is an independent, but deferential, review of

52

the record and the applicable law to determine whether the state court's decision (i.e. the "result") was legally or factually unreasonable. Thus, the undersigned will address the applicable federal precedent concerning delays in presentment and voluntary confessions, and will determine whether the denial of this ground for habeas corpus relief was legally or factually unreasonable.

In McNabb v. United States, 318 U.S. 332 (1943), and Mallory v. United States, 354 U.S. 449 (1957), both of which were appeals from federal criminal prosecutions, the United States Supreme Court found that a delay in presenting an arrestee to a magistrate judge for arraignment can preclude the admission of a confession obtained during the delay. In United States v. Dodier, 630 F.2d 232, 236 (4th Cir. 1980), however, the Court held that a "delay in promptly presenting the accused to a magistrate is a significant factor bearing on the voluntariness issue," but, where a delay is relatively short in duration, such delay does not absolutely preclude admission of testimonial evidence of a defendant's confession.

In the instant case, an evidentiary hearing was held on the admissibility of the various statements that Petitioner made once he was in police custody. The trial court found, after a full and fair hearing, that all of the statements were voluntary and admissible.

The undersigned has reviewed the testimony provided from the pre-trial hearing concerning the facts surrounding Petitioner's arrest and interview and finds that the delay in taking Petitioner before a magistrate judge was not unreasonable and that his statements were knowing and voluntary. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' denial of habeas corpus relief on this claim was not legally or factually unreasonable, and that Respondent is entitled to judgment as a matter of law on this claim.

3. **Ground Five - Illegal Search and Seizure.**

In Ground Five of his federal petition, Petitioner alleges that items entered into evidence were illegally seized from his home and that, as a result, he was denied a fair trial. (# 1 at 47-49). Petitioner adds that "[t]he City Police could have obtained a search warrant authorizing them to lawfully seize these items, but they chose not to follow the constitutionally required judicial process designed to protect citizens['] Fourth Amendment Rights." (Id. at 47). Petitioner adds:

> [After the protective sweep and after Petitioner was taken into custody at a location away from his home,] [i]t was clear that the Petitioner's home was secure. Petitioner was in the police car. There was no reason for an illegal, warrantless search of the Petitioner's home.
>
> It is well settled that whenever the police rely on consent to search, their action must be limited to the scope of the consent they were given. Walter v. United States, 447 U.S. 649, 656-657, 100 S. Ct. 2395, 2401 (1980).

54

> If an officer does not have a warrant to search the
> premises, he may not enter the premises to search for
> items while a warrant is being obtained, unless there are
> exigent circumstances.   It follows that any evidence
> observed open to view after such an illegal entry will
> not be admissible under the Plain View Doctrine because
> the officer was not in a position in which he had a legal
> right to be.   <u>United States v. Griffin</u>, 502 F.2d 959
> ([6th Cir.] 1974).

(<u>Id.</u> at 49).

In his Memorandum of Law, Respondent asserts that Petitioner's
claim that evidence was seized in an illegal search is not
cognizable in federal habeas corpus because Petitioner was
previously given a full and fair opportunity to litigate the claim.
(# 11 at 27).

In his Response, Petitioner asserts, for the first time in
these proceedings, that Detective Miller went into Petitioner's
house and "planted the shotgun shell box, which he claimed was out
on the table."  Petitioner adds:

> This lie was allowed to go before the Jury.   This
> bolstered the State[']s theory to state the Petitioner
> loaded his gun.  Officer Miller had no search warrant nor
> reason to enter the home, and the facts show the only
> reason was to plant evidence to bolster his case and
> cover his warrantless search.

(# 17 at 14).

On July 19, 1999, prior to Petitioner's trial, the trial court
conducted a hearing on Petitioner's motion to suppress evidence.
On August 6, 1999, the trial court issued an order denying the
motion to suppress, finding that Petitioner's ex-wife, who was a
resident of Petitioner's house, consented to a protective sweep of

55

the house, during which the items that were seized, that is, the box of shotgun shells and a gun case, were found to be in plain view.  Accordingly, the trial court denied Petitioner's motion to suppress the evidence.  (# 14, Ex. 12).

The State habeas court found as follows on this issue:

Upon trial counsel's Motion to Suppress items seized from Petitioner's residence, the Court held a hearing on July 19, 1999.  The State called detective K.L. Miller and Officer J.W. Elliott of the Parkersburg Police Department, the Court heard arguments of counsel and took the issue under advisement and allowed parties to submit any authority by 4:00 pm on July 20, 1999.  The Court then held an additional hearing on August 6, 1999 at which time the Court denied trial counsel's Motion to Suppress finding the evidence resulted from a lawful search.

In addition to the pre-trial motions and hearings, trial counsel included the introduction of evidence obtained illegally without the benefit of a search warrant at trial as Ground 1 in Petitioner's Motion for Judgment of Acquittal or, in the Alternative Motion for New Trial.  (Tr. T. vol. 1 of 1 pg 277).  The Court held a hearing on said Motion on February 24, 2000 at which time the Court denied trial counsel's motion.  Trial counsel then filed a Motion to Appeal with the W. Va. Supreme Court.  The Supreme Court denied said Motion.

The Court finds the decision to deny said Motion to Suppress and Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial [was] based on the merits after a full and fair hearing.  The Court further finds Petitioner exhausted his right to appeal by submitting a Petition for Appeal to the West Virginia Supreme Court of Appeals.  The Supreme Court denied the Petition for Appeal.  Therefore, the Court finds Petitioner's ground is barred in this habeas proceeding as the claim has been previously and finally adjudicated under W. Va. Code § 53-4A-1(c).

(# 12, Ex. 6 at 19).

It is well settled that a federal court will not grant habeas relief based on a Fourth Amendment violation if "the State has provided an opportunity for full and fair litigation" of the claim. Stone v. Powell, 428 U.S. 465, 482 (1976).  It is clear from the record that Petitioner previously had a full and fair opportunity to litigate his Fourth Amendment claim, as the State habeas court found.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner's claim that evidence used at his trial resulted from an illegal search and seizure is not cognizable in federal habeas corpus.  The undersigned further proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

**4.   Ground Four - Double Jeopardy.**

In Ground Four of his federal petition, Petitioner claims that his conviction on two separate charges that arose from one single act violated his rights under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, which states, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const., Amend. V.   The

57

petition states in pertinent part[1]:

> A claim that double jeopardy has been violated based on multiple punishments imposed after a single [t]rial is resolved by determining the legislative intent as to punishment. [citations omitted].
>
> In ascertaining legislative intent, a Court should look initially at the language of the involved statutes and, if necessary, legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentence[s] for related crimes. If no clear legislative intent can be discerned, the Court should analyze the statute under the test set forth in Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L.Ed. 306 (1932) to determine whether that is different, then the presumption is the legislature intended to create separate offenses.

(# 1 at 45-46).

Respondent's Memorandum of Law asserts that, under the Blockburger test, Petitioner's conviction on one count of attempted murder and one count of malicious assault for the conduct of shooting and blinding Michael Mollohan did not violate the Double Jeopardy Clause. (# 11 at 28). Blockburger states:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

284 U.S. at 304. (Id.)

Respondent's Memorandum of Law then compares the statutory language of the West Virginia statutes defining malicious assault

---

[1] The pages setting forth Petitioner's claims in his federal petition appear to be somewhat mixed up, with argument in support of certain claims appearing in the discussion of other claims.

and attempted murder.  (Id. at 28-29).  Those statutes state as follows:

§ 61-2-9.  Malicious or unlawful assault; battery; penalties

(a) If any person maliciously shoot, stab, cut or wound any person, or by any means cause him bodily injury with intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a felony and, upon conviction, shall be punished by confinement in the penitentiary not less than two nor more than ten years.  If such act be done unlawfully, but not maliciously, with the intent aforesaid, the offender shall be guilty of a felony and, upon conviction, shall in the discretion of the court, either be confined in the penitentiary no less than one nor more than five years, or be confined in jail not exceeding twelve months and fined not exceeding five hundred dollars.

§ 61-11-8.  Attempts; classification and penalties therefor

Every person who attempts to commit an offense, but fails to commit or is prevented from committing it, shall, where it is not otherwise provided, be punished as follows:

(1) If the offense attempted be punishable with life imprisonment, the person making such attempt shall be guilty of a felony and upon conviction, shall be imprisoned in the penitentiary not less than three nor more than fifteen years.

(2) If the offense attempted be punishable by imprisonment in the penitentiary for a term less than life, such person shall be guilty of a felony and, upon conviction, shall in the discretion of the court, either be imprisoned in the penitentiary for not less than one nor more than three years, or be confined in jail not less than six nor more than twelve months, and fined not exceeding five hundred dollars.

(3) If the offense attempted be punishable by confinement in jail, such person shall be guilty of a misdemeanor and, upon conviction, shall be confined in jail not more than six months, or fined not exceeding one

hundred dollars.

§ 61-2-1. First degree and second degree murder defined; allegations in indictment for homicide.

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance [citation omitted], is murder in the first degree. All other murder is murder in the second degree.

W. Va. Code §§ 61-2-1, 61-2-9, and 61-11-8 (2007).

Based upon the language of these statutes, Respondent argues that "malicious assault requires proof of serious bodily injury not required for attempted murder, while attempted murder, but not malicious assault, requires proof of premeditation or lying in wait with specific intent to kill and an overt act towards the commission of the crime." (Id. at 29). Accordingly, Respondent asserts that they are two separate offenses, and that Petitioner was properly convicted of both charges.

The state habeas court found that this claim was barred under W. Va. Code § 53-4A-1(b)(c), because Petitioner did not raise it in his "Motion for Judgment of Acquittal, or in the alternative, Motion for New Trial," or in his direct appeal. (# 12, Ex. 6 at 20). The court further stated:

Furthermore, the Supreme Court of West Virginia has previously held malicious assault and attempted first-degree murder of the same victim are separate offenses for double jeopardy purposes. The Supreme Court determined malicious assault required proof of serious bodily injury that would not be required for attempted

60

> murder conviction, while attempted murder, but not
> malicious assault, required proof of premeditation or
> lying in wait with specific intent to kill and overt act
> toward commission of crime.  <u>Syllabus Pt. 2, State v.
> George</u>, 185 W. Va. 539, 408 S.E.2d 291.   Therefore,
> Petitioner's indictment and later conviction of both
> malicious assault and attempted murder of the same victim
> did not violate Petitioner's constitutional rights.

(<u>Id.</u>)

The SCAWV's interpretation of these statutes is conclusive and binding on the federal court.  <u>See</u> <u>Wainwright v. Goode</u>, 464 U.S. 78, 84 (1983); <u>Garner v. Louisiana</u>, 368 U.S. 157, 169 (1961)("the views of the state's highest court with respect to state law are binding on the federal courts."); <u>Faircloth v. Finesod</u>, 938 F.2d 513, 517 n.9 (4th Cir. 1991)("This court is bound by the state court's interpretation [of a state statute], and must assume that the statute says what the state court says it says.")

This concept was reiterated in a ruling on a section 2254 petition filed in the United States District Court for the Northern District of West Virginia: "The determination of the intent of the Legislature of the State of West Virginia is solely within the province of the West Virginia Supreme Court of Appeals and its subordinate courts, not with the federal courts.  It is not the role of the federal judiciary to contradict the state courts on their law." <u>Jones v. Painter</u>, 140 F. Supp.2d 677, 679 (N.D. W. Va. 2001)(Broadwater, J.).  The <u>Jones</u> court further stated: "Claims that a state court misapplied its own statutes are not proper for litigation on federal habeas corpus."  <u>Id.</u>

The undersigned proposes that the presiding District Judge **FIND** that Petitioner's conviction on one count of attempted first-degree murder and one count of malicious assault for the conduct of shooting Michael Mollohan did not violate the Double Jeopardy Clause of the Fifth Amendment. The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim are neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

### 5.  Ground Six - Prosecutorial Misconduct.

In Ground Six of his federal petition, Petitioner alleges that he was denied a fair trial because of prosecutorial misconduct. Specifically, the petition states:

> It is the Petitioner's contention that the cumulative effect of numerous misleading, prejudicial remarks during the Trial, exclusive of the prosecutor's comments and the Court's admission of gruesome pictures, has denied the Petitioner his right to a fair Trial. As the Court has previously held, even though any one of the individual Trial errors standing alone would be harmless error the combination of individual errors is sufficient to deprive a criminal Defendant of a fair Trial.

> The oppressive atmosphere of the Petitioner's Trial was a result of the prosecutor's overkill in addition to the Trial Court's acquiescence to the State's impermissible tactics designed to achieve the final justice. The prosecutor in the case before the Court, Ms. Conley, began her opening statement by setting the tone to the jury with sympathy and compassion for the

victims, telling the jury what transpired at the victim's
home on July 6, 1998, the day before the alleged crime.
The prosecutor clearly testified to facts not in
evidence.  (Tr. Pg. 3 L-11-21).

Prosecutor's overkill of the facts clearly presented
this case as a cold, calculated act, when in fact, the
alleged shooting on the Petitioner's part was no more
than an accident when he fell.  There is testimony which
would lead one to believe the actual perpetrator of the
crime could have been someone other than the Petitioner.
As soon as the police focused upon the Petitioner, they
did not look at or investigate any other possibility.
The prosecutor alleged "he took the gun, went into the
living room, pulled a drawer out, chose his shells from
a drawer full of shells, loaded the gun apparently while
sitting at the couch in the living room, loaded the gun,
went outside..." which facts are not in evidence.  (Tr.
Pg. 12 L/20-24).

(# 1 at 50-51).  Petitioner emphasizes that the prosecutors were

allowed to develop evidence that garnered sympathy for the victims

and their families, and asserts that this approach affected the

fairness of his trial.  Petitioner argues that the prosecutor "is

required to avoid the role of a partisan, eager to convict and must

deal fairly with accused, as well, as the other participants in the

Trial."  (Id. at 52).

Petitioner further asserts that "in voir dire, the prosecutor

indicated to potential jurors her disagreement with the law

regarding the penalty for attempted murder, to the affect that the

penalty for attempted murder of one to five years was

disproportionate to other serious crimes."  (Id.)

Respondent's Memorandum of Law correctly asserts that "habeas

relief is only warranted if the prosecutor's remarks rendered the

Petitioner's trial fundamentally unfair."  (# 11 at 30).  The United States Supreme Court has held that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether prosecutor's conduct affected fairness of the trial."  <u>United States v. Young</u>, 470 U.S. 1, 11 (1985).

"Prosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation." <u>Caldwell v. Russell</u>, 181 F.3d 731, 736 (6th Cir. 1999)(citations omitted), <u>abrogated on other grounds</u>, <u>Mackey v. Dutton</u>, 217 F.3d 399, 406 (6th Cir. 2000); <u>see also</u> <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986)("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)).

The Fourth Circuit has enumerated factors to be considered in determining whether improper comments were so damaging to a defendant's trial that his defense was substantially prejudiced, so as to require reversal of his conviction.  Those factors are: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the

remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. United States v. Mitchell, 1 F.3d 235, 241 (4th Cir. 1993). Respondent cites these factors in his Memorandum of Law. (# 11 at 30-31).

Respondent asserts that:

> The Petitioner has not cited to any significant inaccuracies made by the prosecutor during opening arguments. The prosecutor made no improper remarks. The Petitioner also fails to explain how, in light of the overwhelming evidence of guilt presented at trial, the prosecutor's argument, even if improper, prejudiced the outcome of the proceedings. Moreover, there is no objection on the record from the defense.

(Id. at 31). Respondent further argues that no credible evidence that the crimes were accidental was introduced at trial. (Id.)

Furthermore, Respondent asserts that the jury was instructed that the comments of the lawyers were not evidence and were not to be considered as matters of fact, and that jurors are presumed to follow the court's instructions. See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985), citing Parker v. Randolph, 442 U.S. 62, 73, 99 (1979). (Id.) Thus, Respondent contends that the comments of the prosecutors did not unduly prejudice Petitioner's defense or deny him a fair trial. (Id.)

In his Response, Petitioner claims that, in her opening statement, the prosecuting attorney stated that Petitioner went into the bedroom and got the gun and picked out shells and loaded

it before walking outside.  Petitioner states, "[t]his is not testimony given or ever stated by Wanda Johnson."  (# 17 at 18).

Petitioner is in error.  In opening statement, the prosecutor stated: "That gun was taken that evening, according to Wanda Johnson's testimony, from the Defendant's bedroom closet, taken out of a gun case, a long brown gun case, unzipped."  (# 13, Ex. 9 at 12).  Ms. Johnson testified that Petitioner took the gun in its gun case from the corner of the bedroom near the closet, unzipped the case, removed the gun, and left.  (# 13, Ex. 10 at 8-9).

The state habeas court found as follows on this issue:

> Petitioner alleges that numerous misleading prosecutorial remarks during trial set a tone of sympathy and compassion for the victim's children.  Petitioner further alleges the Court allowing the evidence to continue and trial counsel not making the proper objections, which denied Petitioner a fair trial, compounded the injustice.

> The Court would begin by stating Petitioner did not raise this issue in his Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial, or in his Petition for Appeal to the West Virginia Supreme Court. However, trial counsel did file a Motion to Suppress on August 9, 1999, regarding suppression of the testimony of the minor children of Teresa Coleman as their testimony would be inflammatory, prejudicial by injecting an excessive amount of sorrow and sympathy for the surviving children, and cumulative under Rule 403 of the West Virginia Rules of Evidence.  (Tr. T. vol. 1 of 1, pg. 169-170).  The Court denied said Motion to Suppress.  The Court finds the issue of whether or not the child should have been allowed to testify is barred under W. Va. Code § 53-4A-1(b)(c) [1967] as this issue was previously and finally adjudicated through pre-trial motions and hearings.  Out of an abundance of caution, the Court will briefly address the remaining issues.

* * *

> After a review of the record, the Court finds that prosecutor's comments were based on the evidence as presented at trial and did not mislead the jury, prejudice the accused, nor were they made to deliberately divert the jury's attention to extraneous matters.
>
> The Court would also find the remarks did not result in manifest injustice. * * *
>
> Further, based on the evidence adduced, the Court finds it unbelievable that two accidental discharges could strike two different victims standing in two different locations.  In other words, it is not credible that the Defendant could accidentally kill his next-door neighbor and accidentally shoot and blind his neighbor across the street in a brief period of time.

(# 12, Ex. 6 at 22-23).

Based upon a thorough review of the trial transcripts and the other state court records, the undersigned proposes that the presiding District Judge **FIND** that Petitioner's rights to due process and a fair trial were not violated by the conduct of the prosecutors.   The court further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, and that Respondent is entitled to judgment as a matter of law on this claim.

### 6.  Ground Seven - Use of Perjured Testimony.

In Ground Seven of his federal petition, Petitioner alleges that the State used perjured testimony to obtain his convictions. Specifically, Petitioner contends:

67

Detective Bargeloh, during Grand Jury testimony, testified to events that never happened and no State Witness ever backed such testimony.  Patrolman Lambiotte testified at pretrial that when he arrested the Petitioner, he only had one cut on his forehead, when he knew the Petitioner had been struck by one of the officers at the scene rendering the Petitioner semi-conscious.  Detective Miller's testimony that two black 2 3/4 inch shells were found in the magazine of the gun, when found, was not backed up by the State Police Lab either in written reports nor testimony.  <u>Napue v. Illinois</u>, 3 L. Ed. 1217; <u>Gi[g]lio v. United States</u>, 405 U.S. [150], 31 L. Ed.2d 104, 92 S. Ct. 763 (1972).  The Court held that even if the false testimony relates only to the credibility of a government witness and other evidence has called that witness's credibility into question, a conviction must be reversed when there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  Detective Miller testified during pre-trial as follows:

> "Within my sight from the porch was a box containing shotgun shells or at least it said shells on it.  There was several shells, I believe, on the coffee table. (Tr. Pg. 47/l3-15).

During trial Detective Miller testified as follows:

> "Well the lights were on, I couldn't see anybody inside, but as I said I was looking into the residence, you know, it was obvious there was a box of shells there in the table. A couple of shells were outside the box laying there. (Tr. Pg. 299 L1/5).

This line of testimony under oath was a lie.  There is clear evidence supporting this fact in the photographs taken.  (SEE APPENDIX 2).

(# 1 at 52-53).

Respondent's Memorandum of Law asserts that "in order to establish a constitutional violation in this claim, Petitioner must establish that <u>perjured</u> testimony was actually offered at trial.

68

He must then demonstrate that the State knowingly used the false testimony.   Petitioner must then demonstrate that the perjured testimony was sufficiently material to alter the outcome of the trial." (citing Napue v. Illinois, 360 U.S. 264, 269 (1959) and Giglio v. United States, 405 U.S. 150, 154 (1972).   (# 11 at 32)(emphasis in original).

Respondent contends that the statements cited by Petitioner differ only slightly and not in a material way.   (Id. at 33). Respondent further contends that "Petitioner fails to demonstrate that the challenged testimony was sufficiently material to overcome the overwhelming evidence of guilt presented against him at trial. Therefore, Petitioner fails to satisfy any of the standards set forth in the United States Supreme Court cases controlling on this issue." (Id.)   The undersigned agrees.

Both parties have cited the proper Supreme Court authority on this issue.   It is a violation of due process for the State to convict a defendant based upon false evidence.   Napue v. Illinois, 360 U.S. 264 (1959); Giglio v. United States, 405 U.S. 150 (1972); Miller v. Pate, 386 U.S. 1 (1967).   However, a conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict.   A new trial will only be granted if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." Napue, 360

U.S. at 271; <u>Giglio</u>, 405 U.S. at 154.[2]

The state habeas court found that the claim failed to allege the denial of a constitutional right and that "Petitioner's available remedy was impeachment of the witnesses at trial by their prior inconsistent statements, not relief on habeas corpus review." (# 12, Ex. 6 at 23).

Based upon a thorough review of the trial transcript and the other state court records, the undersigned proposes that the presiding District Judge **FIND** that the allegedly perjured testimony consisted of slightly different testimony at pre-trial hearings and at trial, and that Petitioner could have cross-examined the officers about their prior inconsistent statements. Furthermore, Petitioner has not demonstrated a material falsity in the trial testimony.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner's rights to due process and a fair trial were not violated by the allegedly perjured testimony of the police officers. The court further

_____

[2] This standard of review "is consistent with the harmless error standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993)(In federal habeas corpus proceedings, an error is harmful only if it "had a substantial and injurious effect or influence in determining the jury's verdict.")(quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946). <u>See also</u> <u>Sherman v. Smith</u>, 89 F.3d 1134, 1137-41 (4th Cir. 1996)(recognizing that on collateral review of state court convictions, many trial errors of constitutional magnitude may nevertheless be subjected to harmless error analysis)."

proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, and that Respondent is entitled to judgment as a matter of law on this claim.

**7.   Grounds Eight and Nine - Instructional Error.**

In Ground Eight of his federal petition, Petitioner alleges that his constitutional rights were violated when the trial court failed to give Defendant's Instruction No. 5, relating to the unlawful discharge of a firearm, based upon Petitioner's trial testimony, claiming that his only defense was an accidental discharge of the firearm.   (# 1 at 53-54).   Specifically, Petitioner states:

> In State v. Collins, 108 W. Va. 98, 105 S.E. 369 at 370 (1928), our Court stated that our statute (now § 62-3-18) expressly provided that on an indictment for a felony the jury may find the accused not guilty of the felony, but guilty of an attempt to commit such felony, and a general verdict of not guilty upon such indictment shall be unfavorable to subsequent prosecution for attempt to commit such felony.

> In Beck v. Alabama, 477 U.S. 625, 633, 100 S. Ct. 2382, 2387-88, 65 L. Ed.2d 392 400 (1980), the jury was permitted to find the Defendant in the offense charged as common law.  This rule originally developed as an aid to the prosecution in cases which the proof failed to establish some element of the Procedure.

(Id.)

In Ground Nine of his federal petition, Petitioner asserts:

> As noted in the Amended Habeas Petition, Habeas Counsel claims that the Court erred by failing to give

States Jury Instructions No. 1, 2, and 4. However, in this argument, Habeas Counsel then goes on to state that the Circuit Court in fact read Instruction No. 1 to the Jury, which instruction in part stated "Murder in the First Degree is committed when any person unlawfully, intentionally, maliciously, deliberately and premeditatedly kills another person." Thus the Petitioner's Habeas Counsel then goes on to argue that the State failed to meet the element of deliberate. This is obviously confusing as in this assignment of error, Habeas Counsel complains that certain States Jury Instructions were not given, but then yet in the body of his argument goes on to mention they were in fact read to the Jury. Clearly the Circuit Court in denying this assignment of error, took the easy way out by alleging that it did not claim a denial of Constitutional Rights and that furthermore it was finally adjudicated. Thus, the Circuit Court did not notice this obvious inconsistency in this assignment of error. This begs the question of how there could be a full and final hearing on this matter when both Habeas Counsel and the Circuit Court seemed not to understand the very assignment of error alleged. Clearly this ground for assignment of error should have been more fully explored by the Circuit Court and further calls into question the effectiveness of Habeas Counsel.

(# 1 at 54-55).

Respondent's Memorandum of Law addresses these two claims as follows:

It is unclear what the Petitioner's claim is in regard to the instructions given at trial. The case and the statute cited by Petitioner are both utterly inapplicable to the instant case. [FN7]. The statute cited by Petitioner is not a criminal offense but a procedural safeguard against double jeopardy. It does not set forth an indictable offense.

[FN7 reads - § 62-3-18. Conviction of attempt on trial for felony; effect of general verdict of not guilty.

On an indictment for felony, the jury may find the accused not guilty of the felony, but guilty of an attempt to commit such felony;

72

and a general verdict of not guilty upon such indictment shall be a bar to a subsequent prosecution for an attempt to commit such felony.]

The jury was instructed on all possible verdicts of murder in Petitioner's case. (Resp't Ex. 11 at 346-53.) The jury chose, based on the evidence to convict the Petitioner of murder in the first degree. The jury did not convict Petitioner of Attempt [concerning the shooting of Teresa Coleman]. If the jury had considered Petitioner's version of events to be valid, they could have acquitted or convicted Petitioner of a lesser charge of murder. [FN8]  They did not.

[FN8 reads - In West Virginia, accidental killing is a defense to murder. State v. White, 301 S.E.2d 615, 617 (W. Va. 1983). However, "[a]n instruction to the jury is proper if it is a correct statement of the law and if sufficient evidence has been offered at trial to support it." State v. Hall, 298 S.E.2d 246, 255 (1982). Absolutely no credible evidence was presented at Petitioner's trial to support an accidental shooting and Petitioner's outlandish version of events did not qualify nor did the inconclusive testimony of the defense firearms expert. This, however, is a matter of state law and does not present a federal issue cognizable in federal habeas corpus. Grundler,[283 F.2d 798 (4th Cir. 1960)].

Aside from the nonsensical nature of this ground, claims regarding jury instructions do not state a federal claim absent a showing that an instruction "by itself so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 94 S. Ct. 396, 38 L. Ed.2d 368 (1973). "[T]he fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." Estelle v. McGuire, 502 U.S. 62, 71-72 (citing Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983)); Grundler v. North Carolina, 283 F.2d 798, 802 (4th Cir. 1960)("[I]nstructions to the jury in state trial are matters of state law and procedure not involving federal constitutional issues.") Moreover, the omission of a required jury instruction, as alleged here, is "less

likely to be prejudicial than a misstatement of the law." <u>Hendrickson v. Kibbe</u>, 413 U.S. 145, 155 (1977). Inasmuch as Petitioner is claiming he was denied an instruction on his theory of defense, this claim would still fail. "Failure to give an appropriate theory-of-defense instruction, without more, is not a violation of the Due Process Clause. Some other circumstances, demonstrating a serious miscarriage of justice, must be present." <u>Nickerson v. Lee</u>, 971 F.2d 1125, 1138 (4th Cir. 1992)(citation omitted). Given the monumental amount of evidence to support a finding of first degree murder, Petitioner cannot complain that he was deprived of Due Process because an instruction on his theory of defense was not given (if that is the claim). No credible evidence was offered at trial to support the defense's theory of accidental discharge of the weapon. Therefore, there could be no prejudice resulting from the denial of any such instruction.

(# 11 at 33-35).

In his Response, Petitioner asserts:

In the Petitioner's case, the State failed to meet the element of [deliberate]. Petitioner was drunk, and fell with the gun and whether it was the Petitioner who fired the gun when he fell was in dispute by eye witness testimony, and the lack of direct evidence from the State's case in chief.

The State's evidence failed to support the element of "Malice." Again, the Petitioner was drunk, and at best, the gun discharged as he fell, causing the accidental death of another."

(# 17 at 19).

The state habeas court found that both Grounds Eight and Nine fail to allege a constitutional right in order to be properly before the court on habeas corpus review. (# 12, Ex. 6 at 24-25). The state habeas court further stated the following concerning each of these grounds for relief:

74

Petitioner claims Defendant's Jury Instruction No. 5 relating to the unlawful discharge of a firearm should have been given.  The Court addressed objections to jury instructions during trial.   The Court heard arguments from both the State and Petitioner's trial counsel. After considering the instructions as presented by the State and Petitioner's trial counsel and hearing oral argument, the Court decided which instructions would be included in the actual instructions presented to the jury at trial.

Therefore, the Court would further find Petitioner's claim has been previously and finally adjudicated under W. Va. Code § 53-4A-1(b) . . . . This claim was not raised in Petitioner's Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial or in his Petition for Appeal to the Supreme Court therefore the Court finds Petitioner has exhausted his right to appeal such decision.

(Id. at 24).   The state habeas court essentially repeated this finding concerning Ground Nine of Petitioner's petition, which challenges the failure to give State's Instructions No. 1, 2 and 4, adding:

Petitioner's claims that the State failed to prove the elements of malice and deliberately in order to convict Petitioner under the Court's Instruction No. 1 which read, "Murder in the First degree is committed when any person unlawfully, intentionally, maliciously, deliberately, and premeditatedly kills another person." The Court finds Petitioner's claims without merit as the jury by their conviction for Murder in the First Degree believed the State had proven the necessary elements.

(Id.)

Grounds Eight and Nine of Petitioner's federal petition are not well-plead and are confusing.  However, in Ground Eight, it appears that Petitioner is challenging the trial court's failure to give Defendant's Instruction No. 5 concerning the accidental

75

discharge of a gun.  This federal court is not in possession of the actual text of the Defendant's proposed jury instruction.  However, based upon a thorough examination of the transcript memorializing the charge conference, it is apparent that Petitioner had an opportunity to argue the merits of the proposed jury instruction and to lodge an objection to the failure to give the specific instruction, which Petitioner's counsel did.  The colloquy concerning this issue was as follows:

THE COURT:      Okay.  Defendant's Instruction Number 5, why are you offering that, Mr. Kiger?

MR. KIGER:      Your honor, one of the lesser included offenses in State's Instruction Number 1 is involuntary manslaughter, which this Court is well aware involves an unintentional killing during the commission of an unlawful act.  The jury can very well conclude that the killing was unintentional, not intended, but they are not given much guidance of what the unlawful act might have been.  And that jury instruction, which is quoted verbatim from West Virginia Code 20-2-58, informs the jury that discharging a firearm under certain circumstances, enumerated, is an unlawful act.

THE COURT:      Does the State have any comment on that?

MR. DURIG:      Yes, Your Honor.  Assault is an unlawful act.  Wanton endangerment with a firearm is an unlawful act.  Giving this instruction, frankly, I just don't see a reason for it.

MR. KIGER:      Any number of instructions could be given, but this deals specifically with discharging a firearm.

> MR. DURIG:      I think if the Court were to just read
> that to the jury, I can't imagine what
> they would think of.  I think it would
> confuse the Dickens out of them.
>
> THE COURT:      Well,   I   think   that Defendant's
> Instruction Number 5 is unnecessary and
> may confuse  the  jury so I  would  be
> inclined to refuse that.

(# 14, Ex. 11 at 235-236).

As noted by the state habeas court, Petitioner did not, however, raise this alleged instructional error as a ground for relief, either in his "Motion for Judgment of Acquittal, or in the alternative, Motion for New Trial," or in his Petition for Appeal to the SCAWV.  Thus, Petitioner, after a full and fair hearing, waived his right to challenge this issue.

Ground Nine of Petitioner's federal petition does not appear to contain a cognizable claim.  To the extent that Petitioner is challenging the way his habeas counsel plead and argued this ground for relief, such a claim is not cognizable in federal habeas corpus.  Generally, a federal habeas court cannot grant relief based on errors occurring during state collateral review proceedings, including the alleged ineffective assistance of habeas counsel.  See Wright v. Angelone, 151 F.3d 151, 159 (4th Cir. 1998).  Therefore, Petitioner is not entitled to any relief on a claim that his state habeas counsel improperly pled and argued alleged instructional errors.

Furthermore, after a thorough reading of Ground Nine, in conjunction with Ground Eight, it appears that Petitioner is simply arguing that the evidence was insufficient to convict Petitioner of first degree murder, and that the giving of the State's instructions, without a corresponding instruction concerning Petitioner's defense of accidental discharge of the gun, was misleading, and impermissibly led to his conviction for first degree murder.

A review of the transcript of the jury instructions given in this matter, however, indicates that the jury <u>was</u> instructed on accidental killing and accidental discharge of the weapon.  The court instructed the jury as follows:

> The Defendant has denied that he intended to kill Teresa Coleman, that he intended to kill Michael Mollohan, or that he intended to cause bodily injury to Michael Mollohan.  If the jury and each member of the jury believes the Defendant's claim, that he accidentally killed Teresa Coleman and accidentally wounded Michael Mollohan, is established by evidence to a degree which raises in your mind a reasonable doubt as to whether the Defendant Ronald D. Johnson acted with the required intent, then you must find the Defendant Ronald D. Johnson not guilty of any offense that requires the element of intent.

> You may only consider the claim of accidental discharge of the weapon if you are convinced there is evidence demonstrating such a defense to an appreciable degree. If no such evidence has been presented, then you should find that the discharge of the weapon was not accidental.

(# 14, Ex. 11 at 362).

As noted in the federal precedent cited by Respondent, it is well-settled that, unless the failure to give a jury instruction

78

"so infected the entire trial that the resulting conviction violates due process," such a claim cannot serve as a basis for federal habeas corpus relief.  <u>Cupp</u>, 414 U.S. at 141.  The undersigned has thoroughly reviewed the trial transcripts, including the portion containing the charge to the jury, and finds that the jury was properly instructed about the elements of proof required to convict Petitioner on all forms of murder/homicide under West Virginia law.

The jury also heard Petitioner's testimony concerning the alleged accidental discharge of the gun, and the other evidence that Petitioner claims supports his accidental shooting defense. If the jury had believed Petitioner's theory, they could have acquitted him of all of the charges, or found him guilty of a lesser degree of murder or manslaughter, which they did not do.

The undersigned proposes that the presiding District Judge **FIND** that the alleged instructional errors that Petitioner now claims in his federal petition, did not "so infect[] the entire trial that the resulting conviction[s] violate[ed] due process." Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on these two grounds were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on both of these grounds for relief.

**8.    Ground Ten - Denial of Bill of Particulars.**

In the heading of Ground Ten of Petitioner's federal petition, it states that Petitioner's constitutional rights were violated when he was denied a bill of particulars.  However, in the body of that ground for relief, Petitioner actually asserts that he was denied exculpatory evidence by the prosecution, citing to the United States Supreme Court's ruling in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  However, Petitioner does not identify any allegedly exculpatory evidence that he believes was not provided to him.  (# 1 at 55).

Respondent's Memorandum of Law addresses this ground for relief as follows:

> Petitioner claims in ground ten that he was denied exculpatory evidence, presumably because the State did not provide a bill of particulars.  However, Petitioner cites no information withheld by the State.
>
> As a challenge to the denial of a bill of particulars from the State, there is no federal issue in this claim.  Since there is no right for a state prisoner to be indicted by a grand jury, there can be no federal right to a bill of particulars.  <u>Hurtado v. California</u>, 110 U.S. 516, 534-35 (1884).  Due Process requires only that a defendant is properly notified, by charging document, of the charge against him sufficient to build a defense to those charges.  "It is generally sufficient that an indictment set forth an offense in the words of the statute itself, as long as 'those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974)(quoting <u>United States v. Carll</u>, 105 U.S. 611, 612 (1881)).
>
> Petitioner concedes that he was notified of the charges against him.  Nor does he claim that the State

80

> withheld exculpatory evidence or evidence material enough
> to prejudice the outcome of the trial.  This claim fails
> to state a federal issue and it is insufficiently pled.
> "Unsupported, conclusory allegations do not entitle a
> habeas petitioner to an evidentiary hearing." <u>Nickerson
> v. Lee</u>, 971 F.2d 1125, 1136 (4th Cir. 1992).

(# 11 at 35-36).

The state habeas court found that this claim was previously and finally adjudicated, as it was the subject of pre-trial motions and hearings and a decision on the merits was made after a full and fair hearing.  (# 12, Ex. 6 at 25).

Relying upon the federal precedent cited by Respondent, the undersigned proposes that the presiding District Judge **FIND** that Petitioner had no federal constitutional right to a bill of particulars, and that the indictment in which he was charged sufficiently advised him of the charges against him.  <u>See also United States v. Bales</u>, 813 F.2d 1289 (4th Cir. 1987).  Furthermore, Petitioner has not identified any particular exculpatory information that was allegedly withheld that would constitute a violation of Petitioner's rights as defined under <u>Brady</u> and, certainly, Petitioner has not demonstrated that the State withheld any information material to the determination of his guilt, which could have affected the outcome of his trial.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal

law, and that Respondent is entitled to judgment as a matter of law on this ground for relief.

>    **9.  Ground Eleven - Denial of Motion to Dismiss Indictment Based Upon State's Failure to Timely Disclose Discovery and Denial of Speedy Trial.**

Petitioner also alleges <u>Brady</u>-type claims in Ground Eleven of his federal petition.  Specifically, in Ground Eleven, Petitioner alleges that the State failed to disclose witness statements, which were agreed to be supplied in exchange for Petitioner's waiver of a preliminary hearing.  (# 1 at 56-58).  Petitioner states:

>    Petitioner's attorney went to the Prosecuting Attorney's Office and met Prosecuting Attorney Conley on July 29, 1998 to discuss the status of the case. Prosecuting Attorney Conley told him that if the Petitioner might be willing to consider waiving his right to a Preliminary Hearing in the Wood County Magistrate Court in exchange for copies of transcribed witness statements and other documents.

>    On July 31, 1998, Petitioner's attorney went to the Wood County Correctional Center and met with Petitioner to discuss with him the possibility of waiving his right to a Preliminary Hearing in exchange for copies of transcribed witness statements and other documents.

>    Petitioner's attorney then explained to him that sometimes it is a[n] important use of [a] Preliminary Hearing as a "discovery tool," but also explained to the Petitioner that Prosecuting Attorney Conley had agreed to furnish transcribed statements taken from the "scene" of "fact" witnesses, as well as other documents, "if he would agree to waive his right to a Preliminary Hearing." After a length[y] meeting with the Petitioner, he was convinced by his Attorney to authorize his Attorney to inform Prosecuting Attorney Conley he would waive his right to a Preliminary Hearing in exchange for copies of transcribed witness statements and other documents pertinent to his case.

82

On August 3, 1998, the day before the Petitioner's Preliminary Hearing was scheduled to be held in the Wood County Magistrate Court, a letter was hand delivered to Prosecuting Attorney Conley memorializing and confirming the agreement made on July 29, 1998.

When the August 3, 1998 letter was hand delivered by defense counsel to Prosecuting Attorney Conley, she verbally confirmed the agreement. At that time, Prosecuting Attorney Conley also told Petitioner's Attorney that she was waiting to speak with Detective R.B. Bargeloh, the primary investigating officer in this case, to make certain that he had no objections to furnishing the material referred to in the Petitioner's Motion to Dismiss.

On August 4, 1998, not having received any definitive response from Prosecuting Attorney Conley, the Petitioner and his Attorney appeared before the Wood County Magistrate Court to either proceed with the Preliminary Hearing scheduled for that morning, or finalize the agreement referred to in the August 3, 1998 hand delivered letter later made an exhibit to Petitioner's Motion to Dismiss. Prosecuting Attorney Conley appeared at the Wood County Magistrate Court and again verbally confirmed that the agreement referred to above had been reached.

The above information is a constitutional rights to the Petitioner in accordance to his rights to full discovery. Such trickery is, and was unethical for such Prosecutor to go outside of the law to prevent the Petitioner a right to a Preliminary hearing and access to witnessers [sic; witnesses] to whom further infringed upon the right to confront ones accusers. This further lead to denying a proper defense by trial counsel which is incorporated in ineffective assistance in the above cited brief.

The records show the Petitioner was denied exculpatory evidence by the Prosecutor as well as its agents. [again citing Brady].

(# 1 at 56-58).

Respondent's Memorandum of Law concerning this ground for relief states:

83

Petitioner's grounds for this claim are unclear. According to Petitioner's argument, trial counsel and the prosecutor made arrangements for the disclosure of certain evidence in exchange for an agreement by the defense to waive the preliminary hearing. Petitioner appears to argue that he was unfairly deprived of discovery and a preliminary hearing because of the assertions of the prosecutor. However, Petitioner fails to argue any violation of Due Process or a federally guaranteed constitutional right.

Inasmuch as Petitioner is arguing a <u>Brady</u> violation he fails to cite to any evidence intentionally withheld by the prosecution. Rather, Petitioner argues a violation of the rules of disclosure. However, there is no federal right to discovery. <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559, 97 (1977)("There is no general constitutional right to discovery in a criminal case . . . ."); <u>United States v. LaRouche</u>, 896 F.2d 815, 825 (4th Cir. 1990); "Brady, however, created no general constitutional right to discovery in a criminal case." <u>Kasi v. Angelone</u>, 300 F.3d 487, 504 [(4th Cir. 2002)] citing <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 57, 59-60 (1987); "The mere possibility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense." <u>Id.</u> citing <u>United States v. Agurs</u>, 427 U.S. 97, 109-110 (1976).

Furthermore, the Petitioner does not explain how the absence of a preliminary hearing deprived him of a federally guaranteed constitutional trial right, nor does he cite to any United States Supreme Court decisions holding that the absence of a preliminary hearing results in a constitutionally infirm <u>state</u> criminal trial - the issue being litigated.

(# 11 at 36-37).

On this issue, the state habeas court again found that the issue was previously and finally adjudicated under the state habeas corpus statute, as Petitioner's Motion to Dismiss on this basis was the subject of pre-trial motions and hearings, and a decision on the merits after a full and fair hearing.

84

At a hearing on August 10, 1999, Petitioner's counsel moved to dismiss the indictment or to exclude the testimony of witnesses on the basis that the State had not provided him with copies of each of the witness statements that the State possessed.  There was a lengthy discussion about the agreement the parties had reached concerning the production of statements in the prosecutor's possession, in exchange for Petitioner's waiver of his preliminary hearing.  (# 18, Ex. 19 at 2-30).  In particular, Petitioner's counsel was upset because a statement from Troy Coleman, who stated that he saw Petitioner behind his truck with a gun, was not provided to him as part of that agreement.

Petitioner's counsel argued:

> Now, what relief do we want from the Court?  One of two things.  Of course, I will leave it to the Court's judgment as to what the appropriate relief is.  I would like for the Court to enter an order prohibiting the State of West Virginia from calling as a witness in this case, either in their case in chief or in rebuttal, any person, any fact or scene witness - paramedics and police officers excluded, I never intended to get statements from people who got there after it was all over, I just said the police and the paramedics; the scene and the fact witnesses will be the people who were present in and around the Johnson, Mollohan and Coleman houses, and people in the neighborhood who were there when the shootings happened - I would ask the Court to prohibit the State from calling any of those witnesses who gave statements on July 7, '98, or thereafter that were not furnished to me.

> Secondarily, I would as the Court as an alternate remedy to simply dismiss the indictment, restore the parties to the positions they held as of August 3, 1998.

> I think either one of those remedies is, first of all, called for.  Some remedy is called for here.  Which

one, I would leave to the Court.

(Id. at 14).  The prosecutor responded by arguing that her office does not have an open file policy, and she provided him with the statements of the witnesses who would have testified at the preliminary hearing, and all other evidence that she was required by the rules to disclose.  (Id. at 15-19).  The prosecutor further emphasized that Troy Coleman was listed as a potential witness on the State's witness list, which had been provided to Petitioner's counsel.

During this pre-trial hearing, the trial court ruled as follows:

> THE COURT:  Certainly a dismissal or motion in limine would be an extreme remedy.  It certainly would be a miscarriage of justice.  This is an extremely serious matter.  Discovery is normally in writing, so we don't have these disputes arise later.  It seems to me these verbal disclosures or verbal agreements are pretty dangerous in creating misunderstandings or problems later.
>
> It seems to me the Defendant not be entitled to these statements under Rule 26.2 until the actual time of trial in absence of an agreement of the Prosecutor to give up statements, and she, in fact, did give up five statements that are set forth in her August 4, 1998, letter, which she could have held until the time of trial.
>
> So I think Mr. Kiger probably thought he had an agreement; however, Ms. Conley said there was no meeting of the minds, that that was not her understanding of the agreement.  She certainly could have clarified it in her August 4, 1998, letter that she did not agree to all of the requests contained in the August 3, 1998, letter from Mr. Kiger.

Troy Coleman and the other witnesses apparently were identified on a witness list, so there certainly cannot be surprise as to Mr. Kiger.  And, absent any agreement from the Prosecutor, he would not be entitled to the Troy Coleman statement until the time of trial.  So, obviously, under the circumstances and all the circumstances, dismissal of our motion in limine prohibiting the testimony of Troy Coleman and other witnesses whose statements have not been disclosed would be too extreme and would be a miscarriage of justice if that were to be granted.

So, although the Court does not like what happened and disapproves of what happened, I will deny the motion to dismiss and the motion in limine as regards Troy Coleman and other witnesses whose witness statements were not disclosed prior to trial.

(<u>Id.</u> at 29-30).

Petitioner's counsel then moved for a continuance of the trial in order to interview the witnesses whose statements had not been disclosed to him, and to prepare his defense in light of that evidence.  (<u>Id.</u> at 30-31).  The State did not object to the continuance, and Petitioner agreed to the continuance on the record.  (<u>Id.</u> at 31-32, 40).  The trial court granted the motion to continue the trial to the next term of court.  (<u>Id.</u> at 40-41).

The state habeas court again pointed out that Petitioner did not address this issue in his post-trial motions or in his Petition for Appeal.  (# 12, Ex. 6 at 26).

It is well-settled that there is no federal constitutional right to a state court preliminary hearing, and the return of an indictment eliminates the need for such a hearing.  Petitioner was indicted on September 17, 1998.  (# 12, Ex. 1).  Additionally, a

87

preliminary hearing is not designed to afford discovery to a defendant. See, e.g., Goldsby v. United States, 160 U.S. 70, 73 (1895); Gerstein v. Pugh, 420 U.S. 103, 118-125 (1975); Robbins v. United States, 476 F.2d 26, 32 (10th Cir. 1973); Nichols v. Estelle, 556 F.2d 1330 (5th Cir. 1977). Therefore, Petitioner cannot establish a valid claim for habeas corpus relief based solely on the fact that he did not have a preliminary hearing.

Furthermore, to the extent that Petitioner is asserting that the prosecutor's alleged failure to provide witness statements, as promised, somehow denied Petitioner his rights to due process and a fair trial, Petitioner has not demonstrated that any material, and specifically, any exculpatory information was not provided to him by the prosecutor. Accordingly, Petitioner has not demonstrated a Brady violation.

Moreover, Petitioner cannot demonstrate a violation of his right to a speedy trial, as he was the party who moved for a continuance of the trial date. Petitioner cannot establish prejudice based upon a short continuance, at Petitioner's own request, to the next term of court, in order to allow his counsel additional time to prepare his defense. See Barker v. Wingo, 407 U.S. 514, 530 (1972).

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated a violation of his federal constitutional rights based upon the failure of the

prosecutor to provide him with witness statements in return for his waiver of a preliminary hearing, and that Petitioner has not demonstrated that the prosecutor withheld any material and exculpatory evidence, which would have altered the outcome of Petitioner's trial, or that Petitioner suffered any prejudice from the brief continuance of his trial.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

**10. Ground Twelve - Testimony of Patricia Mollohan.**

In Ground Twelve of his federal petition, Petitioner asserts that the trial court abused its discretion in allowing Patricia Mollohan to testify about the affect her husband's blindness has had on their family. Petitioner alleges:

> Testimony by Michael Mollohan's wife as to how her family has been adversely affected by the alleged crimes was irrelevant, severely prejudicial to Petitioner and completely non probative. Thus, Petitioner alleges that the Trial Court abused its discretion in admitting said testimony.

(# 1 at 58). Petitioner then states that Rules 402 and 403 of the West Virginia Rules of Evidence are used to determine if evidence is relevant and admissible. (Id. at 58-59). Petitioner asserts that:

89

The testimony elected by the Prosecutor in case in chief, was outside the scope of the case for proper presentation or foundation of the case. Such testimony would only be proper after and during sentencing faze [sic; phase] in a biforcation [sic; bifurcation] hearing. Such inflammatory testimony violated the Petitioner's right to a full and fair trial based upon evidence, rather than passion and grief.

(Id. at 59). Petitioner cites to West Virginia case law cautioning against the use of such testimony. See State v. Wheeler, 187 W. Va. 379 [419 S.E.2d 447] (1992).

During Petitioner's trial, Patricia Mollohan was called as a witness for the State. She was asked about how her husband's blindness had changed her life. Petitioner's counsel objected to this questioning, but the objection was overruled. Following is that testimony:

Q.   As a result of the shooting, has your husband been blinded, is that right?

A.   That's correct.

Q.   And could you describe to the jury how your life has been changed as a result of that?

Mr. Kiger [Counsel for Defendant]:

Your Honor, I object, respectfully, to how this witness's life had changed.

COURT:    Overruled.

By Ms. Conley [Prosecutor]:

Q.   You may answer.

A.   It has probably changed, I'd say 360 degrees. He - very simple things that he used to enjoy and that he can no longer do. He has found things that he used to do that he's found he can't do. He's been

90

> away from home for two months at a time with the
> training.  Emotionally, the family's in counseling
> and Mike is just not to the point he is even
> feeling some self-worth about himself.  So it had
> changed . . . everything in our lives.  There's
> always. you now, someone needs to be there for
> every minor things sometimes.  It's a drastic
> change."

(Tr. Pg. 782 L/2 - Pg. 784 L/5).  (# 1 at 60-61).

Petitioner asserts that this testimony was irrelevant to any element or issue in his trial, that the prejudicial effect of this testimony outweighed the probative value, and that the testimony should have been found to be inadmissible.  (Id. at 61).

Petitioner further asserts:

> Allowing such testimony to be heard by the Jury was
> a deploy [sic; ploy] by the Prosecutor's apparent Zeal
> only to create a "personal emotional feeling between the
> Jury and Victim's families," in order to create a
> complete   dichotomy   between   court-acquired   and
> extrinsically bias to produce results so intolerable as
> to be absurd, only to obtain a verdict of their choice,
> rather than the evidence presented.  Booth v. Maryland,
> (1987), 482 U.S. 496. 96 [L.] Ed. 2d 440, 107 S. Ct.
> 2529, where it was held that the use of victim impact
> statements   in   capitol   [sic: capital]   sentencings
> proceedings, violates the Eighth Amendment to the Federal
> Constitution by introducing factors that may be wholly
> unrelated to the moral culpability of a particular
> Defendant.
>
> Petitioner herein was sentenced to a term of Life
> Without Mercy.  The victim's family impact statement had
> no foundation into the case in chief, which denied the
> Petitioner his First, Fifth and Fourteenth Amendment
> Right to a full and fair Trial.

(# 1 at 63).

Respondent contends that, in order to state a cognizable claim, Petitioner must demonstrate that the court's alleged abuse

of discretion in admitting this testimony impugned the fundamental fairness of his trial, or infringed upon specific constitutional protections.  <u>Grundler v. North Carolina</u>, 283 F.2d 798, 892 (4th Cir. 1960); <u>Gaskins v. McKellar</u>, 916 F.2d 941, 949 (4th Cir. 1990). (# 11 at 37).  Respondent further contends:

> In order to establish that the challenged testimony impugned the fundamental fairness of the trial sufficient to raise a federal issue, Petitioner must overcome the overwhelming evidence of guilt presented at trial sufficient to establish harmful error.
>
> While this Court stands ready to correct violations of constitutional rights, it also holds that "it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as demonstrable reality."  <u>United States ex rel. Darcy v. Handy</u>, 351 U.S. 454, 462, 76 S. Ct. 965, 970, 100 L. Ed.2d 1331 (1956).

<u>Beck v. Washington</u>, 369 U.S. 541, 558 (1962).

* * *

> There is no ruling in the record by the trial court allowing the challenged evidence in under Rule 403 of the West Virginia Rules of Evidence.  The record only shows that after the prosecutor asked the victim's wife how her husband's blindness had affected her and her family, the defense objected and the trial court overruled the objection.  Nevertheless, as a threshold matter, the issue is not whether the challenged evidence was improperly admitted but whether the admission of the evidence infringed on specific constitutional protections by rendering Petitioner's trial fundamentally unfair.
>
> If the Petitioner proves this, he must also establish that despite the clear evidence of guilt presented at trial, the challenged evidence had a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson</u>,

507 U.S. 619, 623 (1993).

    As previously noted herein and cited to in the
record, there was more than enough evidence presented at
trial to obliterate any doubt in the minds of the jurors
as to Petitioner's guilt.   Petitioner proposed a
preposterous version of events to a jury who had heard
reams of evidence about the purposeful and heinous acts
of Petitioner that resulted in a mother of three being
senselessly killed and a young, working father of two
being blinded.

    The testimony of the wife of the victim who was
blinded by Petitioner regarding the impact of the crime
on her and her husband's life could be characterized as
inflammatory and perhaps irrelevant.   Under different
circumstances such testimony, if protracted and offered
at a trial with minimal or circumstantial evidence, could
have been prejudicial.   But such is not the case herein.
The testimony was brief and in the context of the trial
overall, minimal.   (Resp't Ex. 10 at 158-159).   Nor did
the challenged testimony diminish the presumption of
innocence.

    If Petitioner were re-tried and the challenged
evidence excluded, there is no indication from the weight
of the remaining evidence that acquittal or conviction on
a lesser charge would be likely.

(Id. at 37-39).

    The State habeas court found that this issue was also the

subject of pre-trial motions and hearings.   The State habeas court

further found that:

    [T]he limited evidence presented did not deprive the
    Petitioner of a fair trial.   Evidence of the victim
    Michael Mollohan's blindness and disability was relevant
    to the issue that the victim Mr. Mollohan was permanently
    maimed, disfigured, and disabled, an element of malicious
    assault.   Furthermore, family members of Teresa Coleman
    and Michael Mollohan were present at the time of the
    shootings and witnessed the effect of the crimes on their
    family members.

(# 12, Ex. 6 at 27).

As Respondent has asserted, "an issue involving the admission of evidence will not raise a question of federal constitutional magnitude unless the alleged error was so egregious that the Petitioner was denied a fundamentally fair state trial as a result." Grundler, 283 F.2d at 892.  The undersigned proposes that the presiding District Judge **FIND**, based upon the totality of the evidence presented at Petitioner's trial, and the otherwise overwhelming evidence of his guilt, that the admission of the testimony of Patricia Mollohan concerning the injuries sustained by her husband Michael, and how his permanent blindness has affected Michael, herself and their family, was not so egregious so as to impugn the fundamental fairness of Petitioner's trial.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

## 11.  Ground Thirteen - Failure to Grant Motions to Hire Expert Witnesses.

In Ground Thirteen of his federal petition, Petitioner alleges that the Circuit Court of Wood erred by not granting Petitioner's motions to hire expert witnesses on the issues of intoxication, ballistics, and DNA, and that this failure denied Petitioner his

94

due process rights.  (# 1 at 64-66).  Petitioner states:

> [T]he Petitioner went to great lengths in order to get the Circuit Court to allow him to hire expert witnesses in the field of alcohol intoxication, firearms and ballistics and DNA analysis.  These efforts included not only repeated written and oral Motions to the Circuit Court, but ultimately a Writ of Prohibition to the West Virginia Supreme Court.

> The Petitioner, among other things, sought an expert witness in the field of alcohol intoxication to assist the jury in understanding the effects of extreme intoxication on his ability to form the specific intent to maim, disfigure, disable or kill.  The Court[']s denial of these experts is a serious abuse of the Petitioner's right to fully and fairly present his grounds for post-conviction Habeas Corpus. * * *

> As noted in the Writ of Prohibition, one of the grounds raised for Trial Counsel's Ineffective Assistance of Counsel was his failure to obtain witness to support the Petitioner's partial Defense of diminished capacity, due to intoxication.  Without the assistance of an expert, the Petitioner was unable to make an adequate record to show how a different result would likely [have] occurred, with the assistance of such expert witness testimony.  Certainly there existed sufficient facts from the record to illustrate Defendant's diminished capacity.

> Moreover, the Petitioner was also denied the use of experts to show that the damages inflicted upon the alleged victims were inconsistent with the Defendant[']s gun having been aimed at the victims.  Habeas Counsel noted in his Writ of Prohibition that he had communicated with a William J. Bruchey, [Ph. D.], who indicates that he can compare damage to a victim with damage known to be caused by a particular firearm and ammunition over a known distance.  Finally, although the Defendant's testimony at Trial did not necessarily support a Defense theory of the criminal acts having been committed by a third party, there was evidence at Trial to support the theory of another person at the scene just after the shooting who unlike the Defendant had a ball cap and potentially a gun different from the Defendant[']s gun. (See the fact section above concerning testimony of a double-barrel[] shotgun, a young man running from left to right and back again across Camden Avenue and the fact

that no camouflage ball cap was found.)

Petitioner also desires a firearm expert to examine a third casing found in the bed of his truck which, unlike the two casings found together at the scene on the ground, would show signs of having been exposed to the elements for a period of time. The Petitioner also wanted a DNA Expert to refute the States Expert at Trial, who testified that the blood on the scope was the Defendant['s] blood. In fact, the testimony by the Petitioner in his Habeas Proceedings was that the broken skin and blood on his face were the result of an assault by Law Enforcement when he was arrested. To that extent herein with this Habeas Petition as Appendix I and II are pictures of the Defendant with the relevant wounds (and medical records) as well as pictures of the Defendant['s] coffee table, showing the inconsistency regarding the shotgun shells.

(# 1 at 64-66).

Respondent's Memorandum of Law addresses these issues as follows:

As previously noted, claims regarding trial court rulings do not state a cognizable claim. Aside from that, Petitioner's argument in support of this claim is not supported by the record.

Petitioner did put on his own expert at trial who testified to evidence about the angle of the shot that struck the victims and other details about the crime scene and the location of spent shells and the pellets that hit the victims and areas of the scene. (Resp't Ex. 11 at 32-33).

With regard to evidence of another possible shooter, Petitioner did not file a notice of an alibi defense as required before introducing evidence of such. See W. Va. R. Crim. P. 12.1. Petitioner was prohibited from calling any witnesses to testify to evidence of another shooter at the scene.

As previously noted, the defense's theory was that an errant, jumping, bouncing, self-reloading gun was responsible for the crimes. Petitioner could not claim both an alibi defense owing to second gunman (who also

96

just happened to be on a murderous rampage at the same
time as Petitioner's gun took on a life of its own) and
accidental shooting.  Moreover, there is no order in the
record denying any motion for any defense experts.

As to an expert on intoxication, the record reveals
that Petitioner withdrew his notice of insanity defense
to prevent the State from being provided with a copy of
an unfavorable psychiatric report.  (Resp't Ex. 13;
Resp't Ex. 14 at 9-10).

There is also no evidence in the record that trial
counsel moved for a DNA expert to controvert the State's
DNA expert who testified that the blood on the scope of
the murder weapon matched Petitioner's.  At the habeas
hearing, trial counsel testified that the defense did not
dispute the findings of the State's DNA expert because
Petitioner stated that there were other times when he was
injured by the scope when firing the murder weapon and
that was why his blood was on it.  (Resp't Ex. 15 at 20.)
Indeed, the blood evidence would have also been available
anyway under a general discovery order pursuant to 32.01
of the West Virginia Trial Court Rules.  No specific
order would be required unless there was a dispute.  This
claim is a mere contrivance.

This claim fails to raise a federal issue as a
challenge to evidentiary issues and because it is not
supported by the record.

(# 11 at 39-40).

The state habeas court did not address this ground for relief
in its order denying habeas corpus relief.  There is nothing in the
state court records that have been provided to this court that
would indicate that Petitioner filed any motion to hire expert
witnesses prior to his criminal trial, or that any such motion was
denied by the trial court.  If such a motion was made and denied,
the records thereof have not been provided to this court.

Rather, it appears to the undersigned that Petitioner filed a

motion to hire expert witnesses in conjunction with his state court habeas corpus petition, in order to obtain expert witness testimony in support of the claims raised in that petition, particularly Petitioner's claims of ineffective assistance of counsel for failure to hire additional expert witnesses during the trial phase of his criminal case.

The state habeas court granted Petitioner's request to hire an expert witness on the issue of ineffective assistance of counsel, but denied the request to hire experts in the fields of "firearms and ballistics," "DNA analysis," and "alcohol intoxication."

"Infirmities in state post-conviction proceedings cannot serve as a basis for federal habeas corpus relief." Bryant v. Maryland, 848 F.2d 492 (4th Cir. 1988). Accordingly, as Petitioner seems to only be challenging the state habeas court's denial of his request to hire expert witnesses, this claim is not cognizable in federal habeas corpus. Therefore, the undersigned proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

**12. Ground One - Ineffective Assistance of Counsel.**

In Ground One of his federal petition, Petitioner has asserted 17 claims of ineffective assistance of counsel. However, as argued by Respondent in his Motion and Memorandum of Law, Petitioner did not specifically raise each of these 17 claims in his habeas appeal. Only three of the claims of ineffective assistance of

counsel were specifically addressed in the Petition for Appeal. Therefore, Respondent asserts that only those three claims have been fully exhausted, in order to allow federal habeas review.

The petitioner bears the burden of proving exhaustion. See Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998); Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997). Where a petitioner has failed to exhaust his state court remedies, the federal petition should be dismissed. McDaniel v. Holland, 631 F. Supp. 1544, 1545 (S.D. W. Va. 1986)(citing Preiser v. Rodriquez, 411 U.S. 475, 477 (1973)).

In West Virginia, prisoners may exhaust their available state court remedies either by stating cognizable federal constitutional claims in a direct appeal, or by stating such claims in a petition for a writ of habeas corpus in a state circuit court pursuant to West Virginia Code § 53-4A-1, followed by filing a petition for appeal from an adverse ruling in the SCAWV. Moore v. Kirby, 879 F. Supp. 592, 593 (S.D. W. Va. 1995); McDaniel v. Holland, 631 F. Supp. at 1545. A prisoner may also exhaust the State court remedies by filing a petition for a writ of habeas corpus filed under the original jurisdiction of the SCAWV. However, an original jurisdiction petition that is denied without an indication that the denial is with prejudice following a determination on the merits will not exhaust the prisoner's State court remedies. See Moore, 879 F. Supp. at 593; McDaniel, 631 F. Supp. at 1546; see also,

99

Meadows v. Legursky, 904 F.2d 903, 908-909 (4th Cir. 1990)(abrogated on other grounds, Trest v. Cain, 522 U.S. 87 (1997)).

As noted by Respondent, "the failure to appeal to the state's highest court from a denial of relief on those issues in a state trial court habeas corpus procedurally defaults the unappealed claims. See Whitley v. Blair, 802 F.2d 1487, 1500 (4th Cir. 1986). (# 11 at 16). Therefore, Respondent asserts that "certain portions of the instant petition are procedurally defaulted, and should be dismissed." (Id.)

Petitioner's Petition for Appeal to the SCAWV from the denial of his state habeas petition states in pertinent part:

> In its order denying habeas relief, the Circuit Court discussed the 17 basis alleged by the Petitioner for his ineffective assistance of counsel claim which reference is made to herein. First of all, as discussed later in this appeal under **new** assignment of error, habeas counsel did not fully develop all of these bases at the omnibus hearing. In fact, habeas counsel did not even call trial counsel as a witness - the state did and even then trial counsel appeared at the hearing without his notes or file! How could habeas counsel fully develop such grounds as: 7) Failure to keep Petitioner informed of critical aspects of his case; 10) failing to call witnesses material to the defense; and 13) failing to interview or prepare witnesses for trial without access to trial counsel['s] file and notes and calling trial counsel as a witness in his case in chief.

> Nonetheless, the following of the 17 basis for ineffective assistance of counsel did receive sufficient development or are otherwise of special noteworthiness given the facts from trial and the omnibus hearings:

> 4)   Trial counsel failed to obtain and use a firearm expert.

100

12)    Trial counsel was ineffective for failing to consult with a medical expert on intoxication.

15)    Trial counsel failed to press the fact that the angle in which the Petitioner was standing or at the time he fell could not have inflicted the wounds on the victims.

Unfortunately, the Circuit Court chalks up many errors by trial counsel to decisions of "strategy and tactics" or in the case of the intoxication issue the court claims the Petitioner's argument is "purely speculative." [footnote omitted].  This is incredible given the amount of alcohol the Petitioner consumed on the night in question (the better part of a Fifth of Old Crow).  **The issue of intoxication combined with the conflicting testimony on the angle at which the victims were shot (not to mention one witness seeing a double barrel shotgun as opposed to the single barrel at the scene) would have given the jury great difficulty in finding all of the elements necessary for first degree murder and malicious assault - the resulting in, at worst, maybe a conviction of second degree murder.**  Finally, the testimony from Petitioner and trial counsel at the omnibus hearings show huge differences in their expectations as to an intoxication defense, with the Petitioner claiming trial counsel was going to pursue expert witnesses on how much the Petitioner had to drink and whether he appeared intoxicated (i.e. see the testimony of Patrolman McCullough above)!  This issue clearly should have been developed more fully at the omnibus hearing.

(# 12, Ex. 7 at 36-37)(emphasis in original).

First, as noted previously herein, the alleged ineffective assistance of habeas counsel, or any other alleged errors in habeas proceedings, are issues that are not cognizable in federal habeas corpus.  <u>Bryant v. Maryland</u>, 848 F.2d 492 (4th Cir. 1988)("infirmities in state post-conviction proceedings cannot serve as a basis for federal habeas corpus relief").  Accordingly,

101

to the extent that Petitioner is alleging the ineffective assistance of his habeas counsel as a ground for relief in his federal petition, such a claim is not cognizable and must be dismissed.

Second, the undersigned has thoroughly reviewed the state court records provided to this federal court, and agrees with Respondent's assertion that Petitioner has not fully exhausted all 17 of his claims of ineffective assistance of counsel. In fact, based upon a review of this ground for relief as pled in Petitioner's Petition for Appeal to the SCAWV, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has only exhausted the claims raised in issues number 4, 12 and 15, as listed above.

The exhaustion requirement demands that a petitioner present the "sum and substance" of each claim to both the circuit court and the SCAWV, which Petitioner did not do. See O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); Breard v. Pruett, 134 F.3d 615 (4th Cir. 1998). Accordingly, in accordance with 28 U.S.C. §§ 2254(b)(1)(A),(c), it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion to Dismiss (# 10-1) the remaining claims of ineffective assistance of counsel, as raised in Ground One of Petitioner's federal petition, as being unexhausted. The undersigned will now turn to the merits of the exhausted claims.

The Supreme Court addressed the right to effective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  In Strickland, the Court adopted a two-pronged test for determining whether a defendant was provided inadequate assistance of counsel. The first prong is competence; Defendant must show that the representation fell below an objective standard of reasonableness. Id. at 687-91.  There is a strong presumption that the conduct of counsel was in the wide range of what is considered reasonable professional assistance, and a reviewing court must be highly deferential in scrutinizing the performance of counsel.  Id. at 688-89.

> In order to meet the first prong, a defendant must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Id. at 690.

The second prong is prejudice; "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard." Holman v. Gilmore, 126

103

F.3d  876, 881 (7th Cir. 1997).  Using this standard, and based
upon all of the evidence of record, the court will address the
merit of the three exhausted claims of ineffective assistance of
counsel in the order they were presented by Petitioner.

<u>Failure to obtain and properly use a firearm expert</u>

In claim number 4 of Petitioner's claims of ineffective
assistance of counsel, Petitioner alleges that his trial counsel
failed to obtain and use a firearm expert "to assist in cross-
examination of the State's expert and/or for his impeachment." (#
1 at 28).  Petitioner's federal petition offers no additional
support for this claim.

At trial, Petitioner's counsel called Robert White as an
expert witness on firearms and ballistics, to testify about the
location of the wounds to the victims, the location of the pellet
marks on the houses in the area where the shootings took place, and
the possible angles of the shots.  Respondent's Memorandum of Law
in support of his Motion for Summary Judgment asserts that
Petitioner has failed to argue how more effective use and
questioning of witness White would have altered the outcome of his
trial.  (# 11 at 21).

Concerning this claim of ineffective assistance of counsel,
the State habeas court found as follows:

> The Court finds Petitioner's claim to be without
> merit as it fails to meet the <u>Strickland</u> test for
> ineffective assistance of counsel.  Robert White was
> hired and testified on behalf of Petitioner as a firearm

expert.  At the time of trial, Mr. White was a retired forensic scientist who had previously worked for the West Virginia State Police for approximately thirty years in various capacities doing crime scene investigation and laboratory work.  (T.T. vol. 4 of 4 pgs. 17-19) Mr. White testified that in his opinion, if Teresa Coleman was standing the way the witness [Michael Mollohan] stated, the gunshot that killed her came from the street.  (T.T. vol. 4 of 4 pg. 32) The Court properly found Mr. White to be qualified as an expert and the jury had the ability to consider Mr. White's testimony in their decision to convict Petitioner.  Petitioner has failed to prove trial counsel's actions were unreasonable or that but for the actions of trial counsel Petitioner's outcome would have been different.

(# 12, Ex. 6 at 8).

There are two other claims that are related to this one. First, in claim number 14 of Petitioner's federal petition, Petitioner alleges that his trial counsel was ill-prepared and ineffective in his use of Mr. White as an expert in ballistics and forensic science.  (# 1 at 32-34).  This claim was not specifically addressed in Petitioner's habeas appeal and, therefore, is unexhausted.  Nevertheless, because Respondent addressed this claim in his Memorandum of Law, and because this claim is closely related to the claim addressed above, the undersigned will address the State habeas court's findings on this claim as well.

Second, in claim number 15, which was exhausted in the state courts, Petitioner alleges that his counsel "failed to press the fact that the angle in which the Petitioner was standing or at the time he fell could not have inflicted the wounds on the victims." (# 1 at 34-35).

These three claims all appear to be related to Petitioner's assertion that his counsel did not properly develop a theory that there was another man at the scene with a shotgun, who could have been the shooter.  At trial, Petitioner called his neighbors, Michael and Mitchell Barton, as witnesses to testify about the fact that they both saw the figure of a "young male" run across the street away from Petitioner's house, just after they heard the gunshots.  The Barton brothers also testified that they saw the same figure run back across the street a few minutes later.  It appears that Petitioner is arguing that his trial counsel did not inquire of his expert witness about the possibility that there was another "shooter" at the scene.

Respondent argues that Petitioner has not demonstrated how a different questioning of Mr. White would have altered the outcome of the trial, or how the location of the supposed fleeing male at the scene was probative since Petitioner did not assert an alibi defense, or otherwise deny committing the crimes.  Respondent adds:

> As noted by the habeas court, Petitioner's claim regarding an unidentified male fleeing the scene is little more than a red herring.  Petitioner fails to develop any theory or relevance regarding the possible presence of another person on the scene.  Petitioner never denied killing [shooting] the victim[s].  The shell casings found at the scene matched Petitioner's shotgun recovered on the night of the crimes.  (Resp't Ex. 9 at 362.)  Blood matching Petitioner's was found on the scope of the murder weapon.  (Id. at 398.)  There was no evidence presented at trial that there was more than one firearm used in the crimes.  What material impact any such evidence would have had on the trial is unclear since the Petitioner did not claim an alibi defense.  It

106

is highly possible that there were any number of people fleeing a scene where gunfire was erupting. Trial counsel could not possibly be ineffective for not locating someone who did not exist.

As far as witness White, he testified at trial that the trajectory of the shots came from an angle. (Resp't Ex. 11 at 33). The witness was hired by the defense and gave testimony that was beneficial to the defense. The jury heard evidence of the defense's theory of accidental shooting and chose not to believe it. There was absolutely no credible evidence of Petitioner's version of events other than Petitioner's own self serving testimony.

Petitioner fails to demonstrate what more trial counsel should have possibly done given that an actual attempt was made to locate the supposed other man at the scene. Petitioner also fails to demonstrate how trial counsel was ineffective in light of the testimony of Mr. White. Mr. White was bound by the facts. No expert can ethically testify to facts that support a scenario that never happened. This claim is without merit and insufficiently supported by any credible evidence or facts. See Otey v. Grammar, 859 F.2d 575, 578 (8th Cir. 1988)(Burden is on petitioner to show what additional evidence counsel could have discovered that would have helped defense.); United States v. Mealy, 851 F.2d 890, 908 (7th Cir. 1988).

The Petitioner has not cited any controlling federal precedent that rebuts the presumption that the state court's findings were correct.

(# 11 at 22-23).

The State habeas court found as follows on claim 14:

The Court finds Petitioner's argument problematic. First, Petitioner argues trial counsel was ineffective for not using the report of Robert W. White to support the contention that the gun discharged as Petitioner fell by showing the shot was from the road and at an angle. However, Robert W. White testified at trial stating exactly what Petitioner is now claiming Mr. White should have testified to at trial. Mr. White testified the gun shot residue report was negative for residue on Petitioner. (Tr. T. vol. 4 of 4 pg. 882-883) Based on

107

studies he had conducted, Mr. White testified gunshot residue could stay on a person for up to six hours if a person fires a gun and goes on about their normal business without washing their hands. (T. Tr. vol. 4 of 4 pg. 887) Mr. White also testified the gunshot had to have come from the street and based on the location of the pellets found at the scene the shot was not a level shot and it was on a little bit of an angle. (T. Tr. vol. 4 of 4 pgs. 893-894) Therefore, the Court finds the jury was made aware of Mr. White's expert opinion that the gunshot [c]ame from the street and that it was made at an angle.

Secondly, Petitioner argues trial counsel knew or should have known there existed a possibility that a younger man left the scene, but failed to further investigate to determine whether mitigating evidence existed. Petitioner cites the testimony of Michael Duane Barton (Tr. T. pgs. 108-115) to prove trial counsel should have known about the possibility of another person. However, what Petitioner has cited to is where trial counsel called Michael Barton during Petitioner's case in chief to testify regarding the possibility of another man. The Court finds trial counsel proved he knew about the possibility of another man by calling the witness to testify regarding the issue. The Court also finds that trial counsel employed a private investigation firm, Tri-S Investigation, to try to locate this individual however the efforts were unsuccessful. (Evidentiary tr. 6/3/05 pg. 19) The Court further finds given Tri-S, trial counsel's lawyer, and the police were unable to locate the man who allegedly left the scene. Given the unsuccessful attempts to locate this individual, the Court finds it reasonable trial counsel called the eyewitness to testify regarding what he saw or thought he saw. Regardless, the jury has spoken and the verdict reflects they did not believe another man left the scene or if there was such a man that he was involved in the crimes alleged.

Consequently, Petitioner has not introduced any evidence during the habeas corpus proceeding which would prove there is any reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different. The Court denies Petitioner's claim.

(# 12, Ex. 6 at 14-15).

Concerning claim number 15, the State habeas court found that "the manner in which a trial counsel questions his witnesses are purely strategic and tactical courses of action," and further found that "the line of questioning trial counsel used during Robert White's testimony regarding his opinion as to the angle the shot that killed Teresa [Coleman] came from was reasonable." (# 12, Ex. 6 at 15-16). The State habeas court further found that Petitioner failed to produce evidence to demonstrate that there is a reasonable probability that, but for the alleged errors of his counsel, the outcome of the trial would have been different. (Id. at 16). The undersigned agrees.

In Wiggins v. Smith, 539 U.S. 510, 521-522 (2003), the Supreme Court emphasized that "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Furthermore, in the American Bar Association's "Standards for Criminal Justice," which serve as a guide for assessing reasonable conduct, Standard 4-5.2, concerning "Control and Direction of the Case," states as follows:

> (b) Strategic and tactical decisions should be made by defense counsel after consultation with the client where feasible and appropriate. Such decisions include what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and what evidence should be introduced.

ABA Standards for Criminal Justice, Standard 4-5.2.

It is clear from the trial transcript that the jury was presented with the Barton brothers' testimony that they saw a male figure run across the street after the gunshots were fired. The jury also heard the expert opinion of Mr. White concerning the angle of the gunshots, and his opinion that, if Teresa Coleman was facing the direction that Michael Mollohan said she was, the shots had to have come from the street. Whether and how to emphasize this evidence was a matter of trial strategy that is not subject to second-guessing. Furthermore, Petitioner has not offered any specific line of questions, or any argument concerning how his counsel should have addressed these issues, or what evidence should have been presented, and he has not demonstrated that there is any reasonable probability that the outcome of the trial would have been different, if his counsel's conduct had been different.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this ground for relief.

<u>Failure to call an expert witness on intoxication</u>

In claim number 12 of his claims of ineffective assistance of counsel, Petitioner alleges that his trial counsel was ineffective by failing to consult with a "medical expert" on intoxication, to

110

address the issue of whether Petitioner was so intoxicated that he could not form the specific intent required to commit first degree murder. (# 1 at 31). Petitioner asserts:

> The Petitioner had last eaten at approximately 6:00 p.m. Petitioner started drinking at approximately 9:45 p.m. on July 6, 1998, after opening a new bottle of Old Crow, 84 proof.
>
> He continued to drink until approximately 1:00 a.m. on the morning of July 7, 1998. At that point the Petitioner had consumed about 18 ounces or more out of the 25 ounce bottle of Old Crow.
>
> By the time the Petitioner started to drink, his food intake was zero. If the Petitioner would have been driving and been pulled over by the police, he would have been well over the legal blood alcohol level.
>
> In comparison to the West Virginia Code § 60-6-24 Blood Alcohol Chart, Petitioner's blood alcohol level would have been .436 or more. Petitioner's weight at that time was 130 pounds. Using .029 multiplied by 18 less 60, you would arrive at the level estimated above. This is well over the ability to form intent or be able to shoot a gun with any accuracy. SEE APPENDIX (A).

(Id.)

Respondent argues that no witnesses testified that Petitioner appeared to be physically impaired by alcohol, and "[t]here was no indication that Petitioner was so intoxicated that he was 'incapable of forming an intent to kill, or of acting with malice, premeditation or deliberation' as required to mitigate premeditation under state law." (citation omitted). (# 11 at 25). Respondent further contends:

> Several witnesses, including the Petitioner's wife and law enforcement officers, testified about the Petitioner's demeanor and behavior the night of the

111

crimes.   Wanda Johnson testified that Petitioner came into the room where she was sleeping, turned on the light, retrieved a shotgun and stated "I called the police about twenty minutes ago.  They wouldn't come. I'm going out to quiet them up."  (Resp't Ex. 10 at 7.) The testimony of Wanda Johnson describes Petitioner as purposeful and determined before he shot his victims. "He took a gun out of the corner.  He laid it on my bed. He unzipped it, took it out.  He left the bedroom, went straight through, down the porch to the yard."  (Resp't Ex. 10 at 8.)  Ms. Johnson also testified that she followed Petitioner from the house in an effort to stop him and convince him to wait for law enforcement but he was threatening and combative.  "I laid my hand down and said, 'Let's go in to call 911.'  . . . He told me to get out of there . . . He said, 'Get the f— out of here and go back to the house.'"  (Id. at 13).   Further, DNA evidence matched blood found on the scope of the shotgun with Petitioner's indicating that he was capable of taking aim at his victims.  (Resp't Ex. 9 at 386-398). Law enforcement officers testified that Petitioner exhibited no symptoms of inebriation whatsoever except the odor of alcohol after being confined in the closed space of a police cruiser.  (Id. at 241, 244, 245).  The nurse who treated Petitioner's eye wound (from the scope of the shotgun as a result of the kick) the night of the crimes stated that he appeared alert and oriented and displayed none of the symptoms usually associated with people severely inebriated.  (Resp't Ex. 16 at 16).

(# 11 at 24).

Respondent adds that, since there were no blood tests run immediately after Petitioner's arrest, any expert testimony on Petitioner's level of intoxication would have been completely speculative.  (Id. at 25).  Respondent further asserts that the decision not to present evidence on Petitioner's level of intoxication beyond Petitioner's own testimony, and the observations of other witnesses, was sound trial strategy, as opinions contained in Petitioner's psychiatric evaluation would

112

have been damaging to that theory of defense.  (Id.)

In his Response, Petitioner repeats his speculative theory concerning his probable blood alcohol level, and adds:

> Throughout the closing arguments the Prosecutor made statements that [were] crafted to inflame the jury, and clearly was not in evidence Statement 'he wasn't intoxicated.'    This is nothing but a lie, and Petitioner's trial counsel idly set by and did not object.  Anyone who drank as much as the Petitioner had, there was no way anyone could say he was sober.  Trial counsel clearly ignored this defense.

(# 17 at 11).

The State habeas court found as follows on this issue:

> The Court will begin by rejecting Petitioner's argument that trial counsel was ineffective for failing to consult a medical expert on intoxication, as Petitioner's argument is purely speculative . . . . The Court will not entertain arguments based on pure speculation.  The Court denies Petitioner's claim as it lacks a basis upon which relief can be granted. * * *

> During the habeas corpus proceeding trial counsel testified that from his understanding of the facts and circumstances surrounding the shooting alcohol was not a significant factor.  (Evidentiary tr. 6/3/05 pg. 16) Petitioner's ex-wife Wanda Johnson also gave a statement to the Parkersburg Police on the 7th day of July 1998 in which she made statements regarding Petitioner's use of alcohol.  Mrs. Johnson stated she and Petitioner had been married twenty years before their divorce but had never separated.  (T. Tr. vol. 1 of 1 pgs. 195-196).  In those twenty plus years of marriage Mrs. Johnson stated she had "seen him drunk once since we've been married."  (T. Tr. vol. 1 of 1 pg. 203) When asked if she could tell her husband had been drinking on the night of the shooting, Mrs. Johnson relied, "he did not act it, but apparently he had been drinking" she could tell because "[she] smelled the alcohol on his breath."  (T. Tr. vol. 1 of 1 pg. 197).

> Additionally, the psychiatric evaluation done by the Charleston Psychiatric Group states: "Although Mr.

113

Johnson has a long-standing alcohol problem, it apparently has not significantly interfered with his health, his ex-wife has only seen him drunk once in their 20 years together, and he did not appear drunk or intoxicated when he came in to get the weapon. There was no evidence of any psychotic motive to his acts, which were deliberate, planned and executed. He had the motive of revenge . . ." (Attached evaluation pg. 20) Clearly, the Psychiatric Group did not feel alcohol was a significant factor in the cause of Petitioner's actions. By Order entered the 2nd day of August 1999, trial counsel was able to keep the extremely damaging psychiatric evaluation out of evidence or even seen by the prosecution until the habeas proceeding, by withdrawing Petitioner's plea of not guilty by reason of insanity in response to the State's Motion to Compel Disclosure of Psychiatric Evaluation.

After reviewing all the evidence in the record, the Court finds trial counsel's belief that alcohol was not a significant factor reasonable. The Court further finds when Petitioner took the stand to testify in his own behalf, he placed his use of alcohol on the evening of the shooting in front of the jury for their consideration during deliberation . . . . The jury knew at the time they convicted Petitioner that he had been drinking that night. Therefore, the Court finds Petitioner has not placed any evidence before the Court during this habeas corpus proceeding to show testimony from a medical expert on intoxication would have caused a different result. Consequently, Petitioner's claim fails the <u>Miller</u> test for ineffective assistance of counsel.

(# 12, Ex. 6 at 12-13).

The law in West Virginia has "long recognized that proof of voluntary intoxication may serve to reduce a charge of first-degree murder to second-degree murder where the level of intoxication is 'such as to render the accused incapable of acting with malice, premeditation or deliberation.'" <u>State v. Hobbs</u>, 358 S.E.2d 212, 215 (W. Va. 1987); <u>see also</u>, e.g., <u>State v. Painter</u>, 63 S.E.2d 86, 92 (W. Va. 1950)(evidence of "gross intoxication" may reduce

114

homicide from first-degree to second-degree murder); State v. Brant, 252 S.E.2d 901 (W. Va. 1979)(intoxication defense "can only be used when there is demonstrated a total lack of capacity such that the bodily machine completely fails"); State v. Bush, 442 S.E.2d 437, 440 (W. Va. 1994)(defendant convicted of two counts of second-degree murder based upon evidence of intoxication).  A reading of the relevant case law indicates that the level of intoxication necessary to claim a defense thereon must be extreme.

As noted above, the issue of Petitioner's level of intoxication was placed before the jury, and there was ample testimony concerning other witnesses' observations concerning Petitioner's behavior and possible intoxication.  Unfortunately for Petitioner, most of those observers testified that they did not believe that Petitioner was grossly intoxicated.  Furthermore, without personal observations or a blood test to review, expert testimony concerning the level of Petitioner's intoxication on the night of the crimes, and an opinion concerning whether Petitioner could form the specific intent to kill, and of premeditation and deliberation, would be entirely speculative.

The undersigned proposes that the presiding District **FIND** that the decision of Petitioner's trial counsel not to present expert testimony concerning Petitioner's level of intoxication on the night of the crimes was not unreasonable.  The undersigned further proposes that the presiding District Judge **FIND** that Petitioner has

not demonstrated that there is a reasonable probability that the presentation of such expert testimony would have altered the outcome of Petitioner's trial.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his counsel was constitutionally ineffective. The undersigned further proposes that the presiding District Judge **FIND** that the state habeas courts' denial of relief on this claim was neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this claim.

<u>Other ineffective assistance of counsel claims</u>

Should the presiding District Judge **FIND** that Petitioner has exhausted all of his claims of ineffective assistance of counsel, the undersigned proposes that the presiding District Judge **FIND** that Petitioner is not entitled to federal habeas corpus relief on any of those claims of ineffective assistance of counsel.

The undersigned has conducted an exhaustive review of the trial transcript and other records presented to this court.  Based upon that review, and a review of the claims of ineffective assistance of counsel as pled in Petitioner's federal petition, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has failed to demonstrate that the conduct of his counsel was objectively unreasonable, or that there is any reasonable probability that, but for counsel's conduct, the outcome

116

of his trial would have been different.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state habeas courts' rulings denying Petitioner habeas corpus relief on Petitioner's claims of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on this ground for relief.

### RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment as to all of the exhausted grounds for relief stated in Petitioner's section 2254 petition, and **GRANT** Respondent's Motion to Dismiss as to all unexhausted grounds.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which

117

objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on the opposing party, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and counsel of record.

January 10, 2008
Date

Mary E. Stanley
United States Magistrate Judge